UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. HEINLEIN, on behalf of himself and all others similarly situated, | : : : | CIVIL ACTION NO. 3:12-cv-00386 (JCH) |
| Plaintiff, | : : | |
| V. | : : | |
| WEST PUBLISHING CORPORATION, | : : | |
| Defendant. | : | MAY 15, 2012 |

**MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**ORAL ARGUMENT IS REQUESTED.**

# TABLE OF CONTENTS

I.  Preliminary Statement……………………………………………………………………  1

II.  Proposed Class Definition and Proposed Class Counsel………………………………  4

III.  Summary of Plaintiff's Claim and Common Issues of Fact and Law …………………...  4

    A.  General Copyright Protection for Registered and Unregistered Works …………..  5

    B.  Copyrightability of Court Pleadings, Motions, Briefs, and Other Similar Litigation Documents …………………………………………………………  11

    C.  Retention of Copyright Protection for Publicly Filed Works ………………………  14

    D.  Distinction Between Attorney-Authored Documents and Judicial Opinions and Orders ……………………………………………………………………  18

    E.  Distinction Between Westlaw and Libraries/Collective Works …………………  20

    F.  The Fair Use Doctrine and Its Non-Applicability to Westlaw …………………...  22

        1.  Brief History and Policy Rationale Behind the Fair Use Defense …………  24

        2.  Application of the Fair Use Defense to Westlaw's Publication of the Class Works ……………………………………………………  25

            a.  Purpose and Character of the Use …………………………  25

            b.  Nature of the Copyrighted Work …………………………...  30

            c.  Amount and Substantiality of the Copyrighted Work Used ………  32

            d.  Effect of the Use Upon Potential Markets …………………………  33

    G.  Common Applicability of the Above Legal Principles to the Class Works ………  39

IV.  Relevant History of Copyright Actions Involving Westlaw …………………………  40

    A.  *New York Times Co., Inc. v. Tasini*……………………………………………  40

    B.  *In re Literary Works in Electronic Databases Copyright Litigation*………………  43

        1.  Approval of Settlement Agreement by Southern District of New York……  44

        2.  Second Circuit Decision Vacating the Settlement Agreement ……………  46

|  |  | 3. | Supreme Court Decision ……………………………………………… | 48 |
|  |  | 4. | Second Circuit Remand Decision  ………………………………… | 49 |
|  | C. |  | *Waldman v. Thomson Reuters Corp.* ……………………………………… | 52 |
|  | D. |  | *White* and *Heinlein* Cases ……………………………………………... | 53 |
| V. |  |  | Representative Fulfillment of Non-Jurisdictional Preconditions to Suit by Class Representatives ……………………………………………………… | 60 |
| VI. |  |  | Standard for Class Certification Under Rule 23 ………………………………… | 66 |
|  | A. |  | General Prerequisites Under Rule 23(a) ………………………………… | 66 |
|  |  | 1. | Numerosity ……………………………………………………… | 67 |
|  |  | 2. | Commonality  …………………………………………………… | 68 |
|  |  | 3. | Typicality…………………………………………………………… | 71 |
|  |  | 4. | Adequacy  ………………………………………………………… | 72 |
|  | B. |  | Specific Prerequisites for Damages Claims Under Rule 23(b)(3) ………………… | 74 |
|  | C. |  | Specific Prerequisites for Injunctive and Declaratory Claims Under Rule 23(b)(2) . | 78 |
| VII. |  |  | Conclusion ………..…………………………………………………….. | 80 |

## I.    **PRELIMINARY STATEMENT**

The defendant, West Publishing Corporation, is in the business of selling and marketing online legal research services to legal professionals under the trade name "Westlaw."  By paying subscription fees, Westlaw's subscribers are given access to vast online databases of documents.  These databases contain a variety of legal resources, including original sources of law such as statutes, codes, regulations, judicial opinions, and legislative materials. The Westlaw databases also contain secondary legal resources such as legal periodicals, treatises, and articles.  In addition to these types of primary and secondary resources, Westlaw has also created a database containing *2.4 million* legal briefs, motions, pleadings, and similar documents that have been created by attorneys and filed with state and federal courts in the United States.  In its advertising materials, Westlaw boasts that it has assembled "[t]he world's largest online legal brief bank for litigators" and that by paying additional subscription fees, Westlaw subscribers can "[f]ind new ideas and approaches" and "[g]ain a competitive advantage with briefs written by experts."

The above-described briefs, motions, pleadings, and other court-filed documents have been copied verbatim and made available to Westlaw subscribers as scanned pdf documents in Adobe Acrobat format as well as electronic word-processing documents in Microsoft Word format.  Despite this widespread copying and commercial republication of these works, Westlaw has not obtained any permission from the authors of the works, nor has Westlaw paid any compensation to these authors.

Attorney David J. Heinlein is a member of the bar of the State of Connecticut.  In early 2010, Attorney Heinlein became aware that Westlaw had copied and distributed a court-filed document that he had authored.  Thereafter, Heinlein and his attorneys at Starble & Harris LLC spent over two years investigating, researching, and analyzing the factual and legal issues relating to Westlaw's widespread copying and commercial distribution of the relevant works.  During that time period, there were important clarifications in the law relating to class copyright actions, particularly with respect to actions on behalf of authors who have not registered their works with the U.S. Copyright Office.  As a result of the recent clarifications in the law, the following is now apparent: (1) Online publishers, such as Westlaw, are liable under the Copyright Act for the display of copyrighted works that are placed in their databases without any specific authorization from the authors; (2) a class action under Rule 23 of the Federal Rules of Civil Procedure is an appropriate mechanism for bringing an infringement action against an online publisher that has amassed large quantities of copyrighted works; and (3) a copyright class action may be brought against an online publisher on behalf of authors who have not obtained registration of their works from the Copyright Office, as long as the proposed class representative has obtained such registration of his or her own work and has therefore satisfied the registration requirement on behalf of the class.

On January 17, 2012, as a prerequisite to initiating this action, Heinlein obtained copyright registration of one of his court-filed authored works.  Heinlein seeks to represent a class of attorneys who are similarly situated.

Shortly after Heinlein obtained his copyright registration, but before he initiated his lawsuit, a similar action was initiated in the District Court for the Southern District of New York on behalf of two attorneys, Edward White and Kenneth Elan (collectively, the "White Group").  White v. West Publishing Corp., Case No. 1:12-cv-01340-JSR.  The case was filed on February 22, 2012 and was assigned to the Honorable Jed S. Rakoff, Senior District Judge.

The issues raised in White are substantially similar to the issues raised in the present case. Unlike in the present case, however, the claims in White are against not only Westlaw but also LexisNexis.  More importantly, although the plaintiffs in White have stated a cause of action on behalf of registered authors, they have not stated a cause of action on behalf of *un*registered authors. Accordingly, in the present case, Heinlein's proposed class does not include any authors who have independently obtained copyright registration for their works.  As acknowledged by Westlaw, very few of the 2.4 million attorney-authored works within Westlaw's database have been independently registered with the Copyright Office.  [West Memorandum in Support of Motion to Dismiss dated April 25, 2012 at p. 2, fn. 1].  Thus, the class proposed by Heinlein is undisputedly numerous.  In addition, as

explained in detail below, the proposed class action satisfies all of the requirements for class

certification under Rule 23.

## II.   PROPOSED CLASS DEFINITION AND PROPOSED CLASS COUNSEL

Heinlein's proposed definition of the class is as follows:

> Any attorney, other than a governmental employee, who authored any pleading, motion,
> brief, or other document that was filed in any state or federal court in the United States
> and displayed or made available to Westlaw customers in any Westlaw database at any
> time on or after March 15, 2009, excluding any such document for which a registration
> was obtained from the United States Copyright Office (except to the extent that such
> registration was obtained by a class representative to satisfy a prerequisite to initiate this
> action).  Any such document described in the preceding sentence shall be considered a
> "Class Work."

Heinlein's proposed class counsel is as follows:

> STARBLE & HARRIS LLC
> Avon Park South
> One Darling Drive
> Avon, CT 06001
> Telephone: (860) 678-7775
> Facsimile: (860) 678-8887

## III.   SUMMARY OF PLAINTIFF'S CLAIM AND COMMON ISSUES OF FACT AND LAW

The following is a summary of the plaintiff's claims and an outline of the factual and legal issues

that pertain to those claims.  Heinlein submits that the principles discussed below apply to all Class

Works and all proposed class members, thus making a class action appropriate.

4

A.     **General Principles of Copyright Protection for Registered and Unregistered Works**

Under the Copyright Act of 1976, "[c]opyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). Copyrightable works include "literary works," which are defined as "works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied." 17 U.S.C. § 101.

The author of any original work is the copyright owner of the work and therefore has the exclusive right to reproduce, sell, and distribute the work. 17 U.S.C. §§ 106, 201. Under 17 U.S.C. § 408(a), a copyright owner may seek registration of his or her copyright claim by filing an application with the Copyright Office; but "[s]uch registration is not a condition of copyright protection." 17 U.S.C. § 408(a). Under 17 U.S.C. § 501, "[a]nyone who violates any of the exclusive rights of the copyright owner … is an infringer of the copyright … of the author."

In order to determine whether a work is an "original work" that enjoys protection under the Copyright Act, courts examine whether there has been "independent creation" and "a minimal degree of creativity." Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991); Kregos v. Associated Press, 937 F.2d 700, 703 (2d Cir. 1991). A work is considered independently created when it owes its origins to the author and is not copied from other works. Feist, 499 U.S. at 345. This

5

requirement amounts to "little more than a prohibition of actual copying." Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99, 103 (2d Cir. 1951).

In addition to the requirement of independent creation, a copyrightable work must possess a minimal degree of creativity. Feist, 499 U.S. at 345. Although most independently created works are likely to be sufficiently creative to obtain protection, "[t]here remains a narrow category of [independently created] works in which the creative spark is utterly lacking or so trivial as to be nonexistent." Id. at 358. The author must inject some independent aesthetic or artistic judgment or utilize some creative effort, "no matter how crude, humble or obvious it might be." Id. at 345. Nevertheless, "the requisite level of creativity is extremely low; even a slight amount will suffice." Id. Examples of works that meet the burden of independent creation but fail as insufficiently creative can be described as follows: "fragmentary words or phrases, noncreative variations of musical compositions, numbers generated sequentially or randomly, and … forms of expression dictated solely by functional considerations." 1-2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 2.01[B] (2009). The greater the independent effort in creating the work, the less creativity it must exhibit. Id.; Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 543 (6th Cir. 2004).

Under 17 U.S.C. § 102(b), copyright protection does not "extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." Similarly, facts are not copyrightable

because they are not sufficiently original; they fail to meet both elements of sufficient originality because they are neither independently created nor sufficiently creative.  Feist, 499 U.S. at 344-49; Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 547 (1985).  In Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340 (1991), the Supreme Court held that the contents of a phonebook were not copyrightable.  Feist, 499 U.S. at 361.  As stated by the Court: "No one may claim originality as to facts.  This is because facts do not owe their origin to an act of authorship."  Id. at 347 (internal quotations omitted).  Stated another way, facts are not sufficiently original because the author who recites a "fact" has not created it but has merely discovered it.  Id.  In Feist, the telephone company "may have been the first to discover and report the names, towns, and telephone numbers of its subscribers, but this data does not owe its origin to the [telephone company]."  Id. at 361.

Although facts themselves are not copyrightable, original written expressions that are *based* on facts, or use facts as part of an analysis, form a distinct category and are copyrightable.  Harper & Row, 471 U.S. at 547; Nimmer at § 2.11[B] ("Notwithstanding the denial of copyright protection for the facts set forth in a factual account, it is clear that protection will be accorded to the literal form of expression of such an account if such form is original with the copyright claimant").  Newspaper articles furnish the most obvious examples.  See, e.g., Nihon Keizai Shimbun, Inc. v. Compline Bus. Data, Inc., 166 F.3d 65, 69-70 (2d Cir. 1999); Chicago Record-Herald Co. v. Tribune Ass'n, 275 F. 797, 798-99 (7th Cir. 1921); Inter-City Press, Inc. v. Siegfried, 172 F. Supp. 37, 40-41 (W.D. Mo. 1958).  In Nihon Keizai

Shimbun, Inc. v. Compline Business Data, Inc., 166 F.3d 65 (2d Cir. 1999), the Second Circuit addressed the issue of whether the defendant's near-verbatim abstracts of the plaintiff's articles constituted infringement.  In deciding the threshold issue, the Court found that "[e]ven though there can be no copyright in the news itself, copyright does protect 'the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments.'"  Nihon, 166 F.3d at 70 (quoting Wainwright Sec. Inc. v. Wall St. Transcript Corp., 558 F.2d 91, 95-96 (2d Cir. 1977)).

In Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539 (1985), the Supreme Court addressed alleged infringement by *The Nation* magazine, which published excerpts from an unpublished version of President Gerald Ford's manuscript, "A Time to Heal: The Autobiography of Gerald R. Ford."  The Court found that, although President Ford's autobiography contained non-copyrightable facts, it was subject to copyright protection because it contained the literal expression of those facts.  Harper & Row, 471 U.S. at 546.  In other words, the unique manner in which the former president explained past events was sufficiently original and thus copyrightable.  Id.  "[A]dding imagination to fact can result in a protected work."  1 Nimmer at § 2.11[B].

> The "discoverer" of a scientific fact as to the nature of the physical world, an historical fact, a contemporary news event, or any other "fact," may not claim to be the "author" of that fact. . . . He may not claim that the facts are "original" with him, although there may be originality and hence, authorship in the manner of reporting, i.e., the "expression," of the facts.

1 Nimmer at § 2.03[E] (citations omitted).

Pure compilations of facts, even without protectible written expression, may be sufficiently original to warrant copyright protection.  <u>Feist</u>, 499 U.S. at 344 ("This case concerns the interaction of two well-established propositions.  The first is that facts are not copyrightable; the other, that compilations of facts generally are").  A protectible "compilation" is defined as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."  17 U.S.C. § 101, 103(a).  "Creation of a nonfiction work, even a compilation of pure fact, entails originality." <u>Harper & Row</u>, 471 U.S. at 547.  Consistent with the requirement of originality for non-compilation works, an author of a compilation of facts must independently select and arrange the facts – without copying the selection from another protected work – and display some minimal level of creativity.  <u>Feist</u>, 499 U.S. at 358.  Also consistent with the requirement of originality for non-compilation works, an author of a compilation may "settle upon a selection or arrangement that others have used; novelty is not required."  <u>Id</u>.  Originality merely requires that "the author make the selection or arrangement independently … and that it display some minimal level of creativity."  <u>Id</u>.  "Thus, even a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement."  <u>Id</u>. at 348.

The standard derived from <u>Feist</u> for determining sufficient originality of compilations of facts places focus on the selection, coordination, and arrangement of the work.  <u>Id</u>. at 358.  Since the plaintiff

in <u>Feist</u> merely published the basic information about each person who applied for its telephone service, its selection of facts was too obvious to meet the requisite level of minimal creativity. <u>Id.</u> at 362. Moreover, the plaintiff's coordination and arrangement of the facts failed to demonstrate even a modicum of creativity. <u>Id.</u> Although the origin of the arrangement and coordination of facts belonged to the plaintiff, the Court found that arranging names alphabetically in a telephone directory was an age-old, commonplace practice and was not remotely creative. <u>Id.</u> at 363. The Court concluded that the plaintiff's selection, arrangement, and coordination of names, phone numbers, and addresses failed to meet the requisite level of creativity to meet copyright protection. <u>Id.</u>

Despite the rejection of the plaintiff's claim for copyright infringement, the <u>Feist</u> Court reiterated that "originality is not a stringent standard; it does not require that facts be presented in an innovative or surprising way." <u>Id.</u> at 362. In reference to the requirement of originality, the Court observed: "Presumably, the vast majority of compilations will pass this test . . . ." <u>Id.</u> at 358-59. Clearly, it takes a demonstrable lack of creativity to fail to meet this standard. In fact, following <u>Feist</u>, courts have upheld copyright protection for telephone directories in many cases. <u>See, e.g.</u>, <u>Key Publications, Inc. v. Chinatown Today Publishing Enterprises, Inc.</u>, 945 F.2d 509, 512-14 (2d Cir. 1991) (finding sufficient creativity in the selection, arrangement, and coordination of the businesses included in plaintiff's telephone directory); <u>Le Book Publishing, Inc. v. Black Book Photography, Inc.</u>, 418 F. Supp. 2d 305, 308-09 (S.D.N.Y. 2005) (finding sufficient originality in the selection, arrangement, and coordination of

the information included in plaintiff's directory for the fashion, advertising, and visual production industries).  Similarly, courts have upheld copyright protection for compilations of information such as governmental contact data, see Proven Methods Seminars, LLC v. Am. Grants & Affordable Hous. Inst., LLC, 519 F. Supp. 2d 1057, 1065-66 (E.D. Cal. 2007), and common insurance terms.  See William A. Graham, Co. v. Haughey, 430 F. Supp. 2d 458, 465-66 (E.D. Pa. 2006).

**B.**     **Copyrightability of Court Pleadings, Motions, Briefs, and Other Similar Litigation Documents**

In light of the above standards for copyrightability, it is clear that attorney-authored works such as pleadings, motions, and briefs are entitled to protection under the Copyright Act.  Most, if not all, of these Class Works will contain at least some original written expression that meets the requirements of "independent creation" and "minimal degree of creativity" discussed above.  Indeed, the creation of such a work requires significant portions of original writing and expression.  At a minimum, when an attorney drafts a document to be presented to the court, the attorney uses creative judgment in his or her choice of words.  The attorney also uses creative judgment in deciding which facts to accentuate and how to structure the document.  In addition, most, if not all, Class Works contain creative, original writing when the author applies relevant law to the facts of the case.  Similar to President Ford's expressive – and copyrightable – recount of uncopyrightable historical events, an attorney's expression and application of the law entails sufficient creativity.  These creative and independently created sections are protected under copyright law.

To the extent that any Class Works lack protectible written expressions, they are still copyrightable as protected compilations of facts.  When creating documents for submission to a court, an attorney will draw upon facts from the case, prior case law, statutes, and public data or statistics.  An attorney's job is to format a brief in a manner that is most persuasive to advance his or her client's case.  A successful resolution of a case often depends on the attorney's skillful crafting of a legal argument.  Although facts and laws alone are not copyrightable, it is clear that in preparing a Class Work, an attorney uses sufficient creativity in his or her selection, coordination, and arrangement of facts.  It is this creativity that gives the document copyright protection.  As held in Feist, "as applied to a factual compilation, assuming the absence of original written expression . . . the compiler's selection and arrangement may [still] be protected."  Feist, 499 U.S. at 350.  Certainly, an attorney's pleading, motion, or brief possesses greater originality than a phonebook.

There do not appear to be any reported cases in which a court has specifically addressed the copyrightability of pleadings, motions, briefs, and similar court-filed documents, although courts have consistently determined that other attorney-authored legal documents are protected.  In Pods, Inc. v. Porta Stor, Inc., 484 F.3d 1359 (Fed. Cir. 2007), the court noted: "There appear to be no valid grounds why legal forms such as contracts, insurance policies, pleadings and other legal documents should not be protected under the law of copyright."  Pods, 484 F.3d at 1370 n.6 (quoting 1 Nimmer at § 2.18[E]).  The case of Phoenix Renovation Corp. v. Rodriguez, 439 F. Supp. 2d 510, 516-17 (E.D. Va. 2006),

illustrates how little creativity is necessary for a legal document to enjoy copyright protection.  <u>Phoenix Renovation</u>, 439 F. Supp. 2d at 516-17.   In that case, the plaintiff created contracts for its polybutylene pipe replacement company.  <u>Id.</u> at 516.  The court found that although most clauses of the contract contained standard, unoriginal boilerplate language, some provisions were inserted to meet specific circumstances within the polybutylene replacement industry.  <u>Id.</u>  The court held that the plaintiff's creation of these provisions was "sufficient to satisfy the minimal threshold required for originality."  <u>Id.</u> As an example, the following is one of the provisions that the court found to be sufficiently original: "Client represents that Client has reviewed the rights of Client pursuant to class action settlements involving polybutylene pipe systems. Client recognizes that performance of the Service may adversely effect [sic] Client's eligibility for compensation from such settlements."  <u>Id.</u>

Other courts have used similar reasoning to uphold business forms as sufficiently creative to meet the originality requirement.  <u>See, e.g.</u>, <u>Continental Casualty Co. v. Beardsley</u>, 253 F.2d 702, 704 (2d Cir. 1958) (business forms); <u>Telex Corp. v. Int'l Bus. Machs. Corp.</u>, 367 F. Supp. 258 (N.D. Okla. 1973), <u>aff'd in part and rev'd in part</u>, 510 F.2d 894 (10th Cir. 1975) (business manuals).

In addition, the issue of copyrightability of court-filed documents has been discussed by several commentators, including Tenth Circuit Judge Stanley Birch.  <u>See</u> Stanley F. Birch, Jr., <u>Copyright Protection for Attorney Work Product: Practical and Ethical Considerations</u>, 10 J. Intell. Prop. L. 255, 258 (2003); Davida H. Isaacs, <u>The Highest Form of Flattery? Application of the Fair Use Defense</u>

Against Copyright Claims for Unauthorized Appropriation of Litigation Documents, 17 Mo. L. Rev. 391, 404 (2006); Lisa P. Wang, Note, The Copyrightability of Legal Complaints, 45 B.C. L. Rev. 705, 730 (2004); Michael Whiteman, Appellate Court Briefs on The Web: Electronic Dynamos or Legal Quagmire?, 97 Law Libr. J. 467, 479 (2005).

### C.   Retention of Copyright Protection for Publicly Filed Works

It is important to note that copyright protection for Class Works extends to legal documents filed in court even though they become public records. See County of Suffolk v. First Am. Real Estate Solutions, 261 F.3d 179, 188-190 (2d Cir. 2001); Marvin Worth Prods. v. Superior Films Corp., 319 F. Supp. 1269, 1271 (S.D.N.Y. 1970). In Marvin Worth Prods. v. Superior Films Corp., 319 F. Supp. 1269, 1271 (S.D.N.Y. 1970), the defendant filmmaker claimed that he had not infringed the plaintiff's exclusive license to use comedian Lenny Bruce's copyrighted works because the portions of Bruce's works that he copied were publicly available in court files from prior criminal prosecutions against Bruce. The defendant argued that since "a substantial portion of the material [was] derived from public sources," it was not copyrightable. Id. at 1270. The court, however, rejected this theory and highlighted the absurd results that it would yield:

> I find unpersuasive the contention that the use of such material, if originally copyrighted (as is undisputed here), is rendered innocent by inclusion in legal transcripts or opinions. To hold that such originally copyrighted material becomes somehow dedicated by use in the courts would permit the unraveling of the fabric of copyright protection. If defendants' theory were accepted, James Joyce's Ulysses, for example, would lie within the public domain merely because the United States prosecuted the book, unsuccessfully at that, a generation ago.

14

Id. at 1271.

In County of Suffolk v. First Am. Real Estate Solutions, 261 F.3d 179 (2d Cir. 2001), the Second Circuit addressed whether a county's disclosure of an alleged copyrighted work pursuant to New York's freedom of information law (known in New York as "FOIL") negated any claim of copyright and permitted the recipient to republish the work for commercial purposes.  The Court said no.

> By the statute's plain language, the extent of the state agency's obligation is to make its records available for public inspection and copying. It is one thing to read this provision to permit a member of the public to copy a public record, but it is quite another to read into it the right of a private entity to distribute commercially what it would otherwise, under copyright law, be unable to distribute.

Id. at 189.

In County of Suffolk, the alleged copyright owner was the county itself.  One of the issues in the case was whether the county, as a governmental entity, could own a copyright.  The Court held that such a copyright could exist.  Id. at 187.  The next question was whether such a copyright could survive disclosure to the public as required under New York's freedom of information law.  The Court again answered the question in the affirmative, finding that the holder of a copyright (in that case, the county) could restrict republication, despite the fact that the work was available to the public under FOIL.

> Suffolk County is not attempting to restrict *initial access* but is attempting to restrict only the *subsequent redistribution* of its copyrighted works. There is nothing inconsistent between fulfilling FOIL's goal of access and permitting a state agency to place reasonable restrictions on the redistribution of its copyrighted works.

Id. at 192 (emphasis in original).

15

Implicit in the Court's decision in <u>County of Suffolk</u> is that if a *private* copyrighted work becomes an agency record, the copyright is still preserved and will still restrict the use by the recipient, even if the work is disclosed to the public under a freedom of information law.  With respect to the County of Suffolk's alleged copyrighted work (certain tax maps), state law determined whether the plaintiff, as a county agency, was prohibited from holding a copyright in the first instance.  (See Section III. D below.)  Since a state law obviously cannot diminish a private citizen's copyright under federal law, the key holding in <u>County of Suffolk</u> for the purpose of the present case is that a document does not lose its copyright when it becomes an "agency record" available to the public.

This basic principle is also illustrated in <u>Weisberg v. U.S. Dep't of Justice</u>, 631 F.2d 824 (D.C.Cir. 1980).  In that case, a private citizen, Weisberg, requested that the FBI produce copyrighted photographs that a *Time* magazine employee had taken of the scene of Martin Luther King, Jr.'s assassination.  The FBI allowed Weisberg to view the photographs but would not provide him with copies of the photograph without *Time's* consent.  Weisberg filed suit, claiming that FOIA required the FBI to provide him with copies.  The court held that the photographs had become "agency records" under FOIA, but that did not mean that Weisberg was entitled to receive copies from the FBI: "Deciding that copyrighted materials are subject to FOIA, however, does not resolve whether any particular FOIA request should be granted, and if so, under what terms."  <u>Id.</u> at 828.  The court further held that the

copyright holder, *Time*, should have been joined as a necessary party to the case.  As stated by the court, "The district court's ruling vitally affect the value of *Time's* alleged copyright."  Id. at 829.

As in County of Suffolk, implicit in Weisberg is the basic principle that a copyright is not lost when a work becomes an agency record.  This principle was acknowledged by Congress when it revised the Copyright Act in 1976.  In its notes to 17 U.S.C. § 105, the House Judiciary Committee commented that "publication or other use by the Government of a private work would not affect its copyright protection in any way."  H.R.Rep. No. 1476, 94th Cong., 2d Sess. 60 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5672.  This principle applies to attorney-authored pleadings and motions that are filed with the courts.  An attorney's work product often "represents and reflects years of experience and countless hours of drafting and revision."  Birch, supra, at 257.  If copyright protection of these attorney-authored documents ceased as soon as they were filed, copyright law would fail to achieve an essential purpose "to assure contributors to the store of knowledge a fair return for their labor."  See Harper & Row, 471 U.S. at 546.

Interestingly, under the federal E-Government Act of 2002, the federal judiciary must begin to make documents filed with the courts available to the public online.[1]  While the government's publication of court documents may raise fair use concerns (see discussion at Section III.F below), it would not affect whether a document is original and copyrightable, since original works receive automatic copyright protection from the moment they are created.  Well-Made Toy Mfg. Corp. v. Goffa Intern. Corp., 210 F. Supp. 2d 147, 157 (2002).  Accordingly, there is no sound argument to support the loss of copyright protection for an attorney-authored work simply because the document is filed with the court and becomes part of a public record.

> D.    **Distinction Between Attorney-Authored Documents and Judicial Opinions and Orders**

Although attorney-authored litigation documents are copyrightable even though they become part of a case file, judge-authored opinions and orders are not copyrightable.  Banks v. Manchester, 128 U.S. 244, 253 (1888).  In Banks, the Supreme Court held that granting copyright of judicial opinions runs contrary to public policy because state and federal judges are salaried employees paid by the public and their opinions are "a declaration of unwritten law, or an interpretation of a constitution or statute"

---

[1] Whiteman, supra, at 480-81 (citing E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899). The E-Government Act was enacted on December 17, 2002, with most provisions taking effect on April 17, 2003.  E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2961 (codified as amended in scattered sections of U.S.C).  Under the Act, each federal court is required to publish online, and make freely accessible to the public, documents that are electronically filed with the court.  See § 205(a)-(c), 116 Stat. at 2913-14.  Furthermore, the federal courts are permitted to upload, and make accessible online, any paper document filed with the court.  § 205(c)(1), 116 Stat. at 2914.

that is binding on every citizen.  Id. at 253-54.  By contrast, pleadings, motions, briefs, and other attorney-authored documents are not excluded from copyright protection, because they are not a source of law.  Although they may be persuasive and influence judicial opinion, they do not carry the weight of law.

Works created by federal employees are also not copyrightable.  Pursuant to 17 U.S.C. § 105, "[c]opyright protection under this title is not available for any work of the United States Government, but the United States Government is not precluded from receiving and holding copyrights transferred to it by assignment, bequest, or otherwise."  "[A] work of the United States Government" is defined in § 101 as "a work prepared by an officer or employee of the United States Government as part of that person's official duties."  17 U.S.C. § 101.  Under this definition, works authored by federal government attorneys are not copyrightable, since any litigation document would have been prepared as part of the attorney's official duties.  Given this limitation, Heinlein's proposed definition of Class Works excludes all works created by employees of the federal government as part of their official duties.

Works authored by state employees may be subject to the same restrictions.  Although nothing in the Copyright Act prevents a state employee or entity from copyrighting a work, "state law determines whether [a public official] may claim a copyright in his office's creations," Microdecisions, Inc. v. Skinner, 889 So.2d 871, 875 (Fl. 2004), and state laws vary on this issue.  In Florida and California, courts have denied copyright protection to works produced by state entities because copyrighting such

documents would conflict with their specific public records laws.  Id. at 876; County of Santa Clara v. Superior Court 170, Cal. App. 4th 1301, 1333 (2009).  By contrast, courts in New York and South Carolina have recognized copyright protection in works produced by state entities.  County of Suffolk, New York v. First American Real Estate Solutions, 261 F.3d 179, 188 (2d Cir. 2001); Seago v. Horry County, 378 S.C. 414, 424-425 (2008).  Given the apparent differences among states on this issue, Heinlein has excluded from the proposed definition of Class Works all documents created by employees of states (or their political subdivisions) as part of their official duties.

## E.    Distinction Between Westlaw and Libraries/Collective Works

Title 17, § 108 of the U.S. Code provides an exemption from infringement liability for libraries and archives when they reproduce no more than one copy of a work, if: (1) the reproduction or distribution is made without any purpose of direct or indirect commercial advantage; and (2) the collections of the library or archive are open to the public or available not only to researchers affiliated with the library but also to other persons doing research in a specialized field; and (3) the work is reproduced with a notice of copyright.  Libraries within "profitmaking[] or proprietary institutions are also eligible for the exemption as long as the reproduction (and distribution) was itself not commercially motivated."  2 Nimmer at § 8.03[A][1].  As indicated in the applicable legislative history, "[i]solated, spontaneous making of single photocopies by a library in a for-profit organization, without any

systematic effort to substitute photocopying for subscriptions or purchases, would be covered by section 108." H.R. Rep. No. 94-1476 at 75 (1976), <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5689.

The issue that arises under § 108 is whether the reproductions were made "without any purpose of direct or indirect commercial advantage." 17 U.S.C. § 108(a)(1). The legislative history of the section offers this guidance: "the 'advantage' referred to in this clause must attach to the immediate commercial motivation behind the reproduction or distribution itself, rather than to the ultimate profit-making motivation behind the enterprise in which the library is located." H.R. Rep. No. 94-1476 at 75 (1976), <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5689. In other words, if the work is reproduced by a library within a profit-making institution for the purpose of aiding, educating, or helping with innovation, it is likely to fall within this exemption. <u>See</u> 2 Nimmer at § 8.03[A][1]. By contrast, "a purely commercial enterprise could not establish a collection of copyrighted works, call itself a library or archive[], and engage in for-profit reproduction and distribution of photocopies." H.R. Rep. No. 94-1476 at 74, <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5688.

Westlaw cannot claim an exemption as a library or archive under § 108 because its reproduction of attorney-authored Class Works serves the purpose of a "direct commercial advantage." Westlaw has reproduced and distributed copyrightable work product to consumers for a profit. Clearly, there is an immediate commercial motivation behind the reproduction and distribution of these documents.

Similarly, Westlaw cannot claim that its database or the contents thereof constitute a "collective work" or a "revision of a collective work" within the meaning of 17 U.S.C. § 201(c).  Under § 201(c), publishers of collected copyrighted materials have certain rights to publish those materials if the works, in the aggregate, are considered a collective work or a revision of a collective work.  In <u>New York Times Co., Inc. v. Tasini</u>, 533 U.S. 483 (2001), the Supreme Court unambiguously held that databases such as Westlaw do not qualify as collective works or revisions of collective works.  The <u>Tasini</u> case is discussed in greater detail in Section IV.A below.

### F.    <u>The Fair Use Defense and Its Unavailability to Westlaw</u>

Perhaps the most important limitation on an author's exclusive rights is the "fair use" defense. Under 17 U.S.C. § 107, Congress has allowed the "fair use" of copyrighted material "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship or research."  To determine whether an infringing work is a "fair use," a court must consider the following four statutory factors:

   (1)    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

   (2)    the nature of the copyrighted work;

   (3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

   (4)    the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The first and fourth factors tend to be given more weight than the second and third factors.  See Harper & Row, 471 U.S. at 566 ("[The] last factor is undoubtedly the single most important element of fair use"); Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994) (finding that although the first factor is not absolutely necessary for a finding of fair use, works that pass this first factor "lie at the heart of the fair use doctrine"); Pierre N. Leval, Towards a Fair Use Standard, 103 Harv. L. Rev. 1105, 1116 (1990) ("Factor one is the soul of fair use. A finding of justification under this factor seems indispensable to a fair use defense").  The judicial rationale for this increased weighting is the perceived importance of these factors in promoting underlying copyright policies.  See Campbell, 510 U.S. at 579 ("[T]he goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works").

An infringing use is likely to be deemed a "fair use" when it serves a nonprofit purpose, involves only copies from the copyrighted original that are necessary, and has no effect on the potential market for, or value of, the copyrighted work.  Id. at 581-83, 591-92.  Heinlein strongly contends that Westlaw's publication of the Class Works for profit is not a fair use because, among other reasons, the publication serves a commercial purpose; it has a harmful effect on the potential market for the Class Works; it involves verbatim copying; and the Class Works consist of expositive and persuasive writing authored by professionals who specifically earn their livelihood and their reputations as authors of such works.

Below is a general discussion of the fair use doctrine and its application to the present case.  The discussion is not intended to be exhaustive of this issue.  In addition, there may be facts revealed or developed through the discovery process that impact the application of this potential defense.  Thus, the following discussion is based solely on the relevant facts as Heinlein and the proposed class counsel currently know them.  It should also be noted that Westlaw has not actually articulated a fair use defense in this case, so it is not known whether such a defense will in fact be raised.  Nevertheless, in light of the frequency with which infringers invoke fair use as a defense, it is appropriate to identify and discuss the issue as a likely "common issue" relevant to class certification.

**1.      Brief History and Policy Rationale Behind the Fair Use Defense**

Prior to the Copyright Act of 1976, the fair use defense was a judicially created defense to copyright infringement.  4 Nimmer at § 13.05.  Courts labeled the defense an "equitable rule of reason," H.R. Rep. No. 94-1476 at 65, <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5679, and permitted its use to further serve the underlying purposes of copyright law: to advance public learning and knowledge, and to promote the arts and sciences.  <u>See</u> <u>Harper & Row</u>, 471 U.S. at 545-46.  The defense allowed courts "to avoid rigid application of the copyright statute when … it would stifle the very creativity which that law is designed to foster." <u>Stewart v. Abend</u>, 495 U.S. 207, 236 (1990) (quotations and citations omitted).  Adopting that rationale, Congress codified the defense in 1976, leaving the doctrine substantively unchanged.  <u>See</u> H.R. Rep. No. 94-1476 at 66, <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5680

24

("Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way").

The passage of the Copyright Act of 1976 left unchanged the obligation of courts to decide the merits of a fair use defense by assessing and weighing the four factors on a case-by-case basis. See id. ("Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis"). Whether Westlaw's publication of the Class Works is a fair use must be determined by analyzing each of the factors.

    2.    **Application of the Fair Use Defense to Westlaw's Publication of the Class Works**

         a.    *Purpose and Character of the Use*

The first factor used to determine fair use under § 107 raises two questions: (1) Is the use for commercial or nonprofit educational purposes? and (2) Is the work transformative or does it merely supersede the original? Campbell, 510 U.S. at 579. As Judge Leval noted in his frequently quoted law review article, Towards a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990), this initial factor is "vitally important to the fair use inquiry, and lies at the heart of the fair user's case." A judicial finding that an infringing work was created for a commercial purpose will weigh against a finding of fair use. Campbell, 510 U.S. at 578, 585. By contrast, a finding that an infringing work transforms the original by adding a new meaning, expression, or message will weigh in favor of fair use. Id. at 579.

In the present case, Westlaw's publication of the Class Works serves a clear commercial purpose, thus strongly militating against any potential fair use defense.  As stated by the Supreme Court in <u>Sony Corp. of America v. Universal City Studios, Inc.</u>, 464 U.S. 417 (1984), "every commercial use of copyrighted material is *presumptively* an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright. " <u>Id.</u> at 417 (emphasis added).  "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."  <u>Harper & Row</u>, 471 U.S. at 562.  Courts are reluctant to sustain a claim of fair use when the defendant's use "can be fairly characterized as a form of 'commercial exploitation,' i.e., when the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material."  <u>American Geophysical Union v. Texaco Inc.</u>, 60 F.3d 913, 922 (2d Cir. 1994).

In analyzing a potential fair use defense by Westlaw, it is important to distinguish Westlaw's use from the uses made by Westlaw's subscribers.  Indeed, whether a Westlaw subscriber uses a brief obtained from Westlaw for a commercial or noncommercial purpose is not germane to a determination of whether *Westlaw's* use is a fair use.  The challenged use in this case is Westlaw's for-profit publication of the Class Works, not the end use by a Westlaw subscriber.  "[C]ourts have . . . properly rejected attempts by for-profit users to stand in the shoes of their customers making nonprofit or noncommercial uses."  <u>Princeton Univ. Press v. Mich. Doc. Servs.</u>, 99 F.3d 1381, 1389 (6th Cir. 1996)

(quotations and citations omitted).  As stated in the venerable Nimmer copyright treatise, "one who reproduces copyrighted material for profit is engaged in a commercial use, even if the customers supplied with such material themselves use it for personal use."  4 Nimmer at § 13.05[A][1][c].

For example, in <u>Princeton Univ. Press v. Mich. Doc. Servs.</u>, 99 F.3d 1381 (6th Cir. 1996), the issue was whether a copy shop committed copyright infringement when it reproduced portions of copyrighted scholarly works, bound the works, and then sold them to students as part of a course packet. Although the copy shop claimed fair use, the court held that the infringing party could not rely on the ultimate educational use by the end users (the students) for purposes of the fair use defense.  <u>Id.</u> at 1386. The court reasoned: "if the fairness of making copies depends on what the ultimate consumer does with the copies, it is hard to see how the manufacture of pirated editions of any copyrighted work of scholarship could ever be an unfair use."  <u>Id</u>. at 1386 n.2.  An attorney's use of a Class Work, even for a noncommercial purpose such as education, does not alter the fact that Westlaw has reproduced the copyrighted work product for a commercial purpose.

When an alleged infringing work transforms the original rather than "supersedes its objects," the "purpose and character of the use" factor may weigh in favor of fair use, even if the use is commercial. <u>Campbell</u>, 510 U.S. at 578 (quoting <u>Folsom v. Marsh</u>, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (No. 4901)); <u>Harper & Row</u>, 471 U.S. at 562.  A work is transformative when it "adds something new, with a further purpose or different character, altering the [original work] with new expression, meaning or

message." Campbell, 510 U.S. at 579.  As Judge Leval explained, "a quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the test."  Leval, supra, at 1111. Some "transformative uses may include criticizing the quoted work, exposing the character of the original author, proving a fact, or summarizing an idea argued in the original to defend or rebut it."  Id. The transformative nature of an infringing work weighs in favor of fair use because "the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works."  Campbell, 510 U.S. at 579.  The more transformative the work, the less weight a court will give to the other factors that weigh against a finding of fair use.  See id.

The preamble of 17 U.S.C. § 107 lists specific transformative purposes – such as news reporting, commenting, criticism, and educational – as possible fair uses.  This list was not meant to single out any particular use as a presumptively fair use, nor did Congress intend for it to be exhaustive of all possible fair uses.  Harper & Row, 471 U.S. at 561.  Nevertheless, "[t]he first fair use factor calls for a careful evaluation whether the particular quotation is of the transformative type that advances knowledge and the progress of the arts or whether it merely repackages, free riding on another's creations."  Leval, supra, at 1116.  The Second Circuit has cautioned against an overuse of this defense: "The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance."  Iowa State Univ. Research Found., Inc., v. Am. Broad. Cos., 621 F.2d 57, 61 (2d Cir. 1980).  The Supreme Court

reinforced this rationale in <u>Harper & Rowe</u>.  In that case, the defendant, *The Nation* Magazine, printed a news article containing a portion of President Ford's memoirs.  The Court found that the defendant's use of quotes, paraphrases, and facts drawn from the manuscript was not a fair use despite serving, in part, a "news reporting" purpose.  <u>Harper & Rowe</u>, 471 U.S. at 557.  As observed by the Court: "The promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report' of the book."  <u>Id.</u>  "[C]ourts should be chary of deciding what is and what is not news. . . . The issue is not what constitutes 'news,' but whether a claim of newsreporting is a valid fair use defense to an infringement of copyrightable expression."  <u>Id</u>. at 561 (citations and internal quotes omitted).  Applying a similar rationale, the court in <u>Nihon</u> found that the defendant's published abstracts, which were direct translations of the plaintiff's articles, were not a fair use.  <u>Nihon</u>, 166 F.3d at 72.  The court found that the abstracts were not transformative and weighed "strongly against fair use."  <u>Id.</u>

  In the present case, Westlaw has reproduced and published exact copies of the Class Works without any alterations, critique, or commentary.  Because Westlaw's for-profit publications of the Class Works are not transformative, this weighs against a finding of fair use under the "purpose and character of the use" factor.  Documents copied and published by Westlaw are certainly far less transformative than the translated abstracts from <u>Nihon</u> and the article in <u>Harper & Row</u>.  In short, it is difficult to see how a court could possibly find in favor of Westlaw as to the first fair use factor.

b.      *Nature of the Copyrighted Work*

The second factor for determining fair use under § 107 is the nature of the copyrighted work. The use of a copyrighted work that is deemed creative, rather than factual or informative, tends to weigh against a finding of "fair use."  <u>Campbell</u>, 510 U.S. at 586; <u>see also</u> 4 Nimmer at § 13.05[A][2][a] ("[T]he more informational or functional the plaintiff's work, the broader should be the scope of the fair use defense").  As discussed in Section III.A above, all copyrightable works meet the standard of minimum creativity.  However, under the second fair use factor, the less creative an original work, the more susceptible it is to a defense of fair use.  <u>Compaq Computer Corp. v. Ergonome Inc.</u>, 387 F.3d 403, 410 (5th Cir. 2004).  "[W]ith respect to . . . [works] such as a catalog, index or other compilation, there is a greater license to use portions of such work under the doctrine of fair use than would be the case if a creative work had been involved."  4 Nimmer at § 13.05[A][2][a](internal quotations omitted). Scientific, historical, and news-related documents tend to fall squarely within this less-protected group. <u>See</u> <u>Am. Geophysical Union v. Texaco, Inc.</u>, 802 F. Supp. 1, 17 (S.D.N.Y. 1992) (finding second factor weighed against fair use for science and technical articles); <u>but see</u> <u>Princeton Univ. Press v. Mich. Doc. Servs.</u>, 99 F.3d 1381, 1389 (6th Cir. 1996) (finding that history-based schoolbooks are sufficiently creative to tilt this factor against fair use).  "Since the risk of restraining the free flow of information is more significant with informational work, the scope of permissible fair use is great."  <u>Consumers Union of the United States, Inc. v. Gen. Signal Corp.</u>, 724 F.2d 1044, 1049 (2d Cir. 1983) (finding that

30

*Consumer Reports* magazine was an informative work, thus the second factor weighed in favor of fair use).

Overall, this second fair use factor is given little weight relative to the other three factors.  See Campbell, 510 U.S. at 586.  As noted by Nimmer, "this second factor more typically recedes into insignificance in the greater fair use calculus" and is given little weight.  4 Nimmer at § 13.05[A][2][a] (citations omitted).  Nevertheless, Heinlein contends that this factor militates against a finding of fair use by Westlaw because the Class Works are not mere recitations of facts that are composed by attorneys incidental to their jobs.  Rather, the Class Works are pieces of expository and persuasive writing created by highly educated professionals who earn their livelihood and their reputations based in large part on their skill and creativity as writers within this genre of composition.  Attorneys are professional writers whose creativity of written expression is a significant factor in their legal success.  Westlaw obviously recognizes this fact and uses it as a primary marketing tool.   Indeed, Westlaw implores potential customers to unlock the creativity and written expressions of other attorneys – to "[f]ind new ideas and approaches" and "[g]ain a competitive advantage with briefs written by experts."  [Ex. A (Westlaw Promotional Pages); Ex. B (Heinlein Affidavit) at ¶ 13].  In fact, based on these bold statements, it appears that Westlaw has specifically selected the Class Works for publication due to their creativity.  If the Class Works were not considered significantly creative, then it is hard to imagine that Westlaw would find it financially worthwhile to copy, publish, and actively market *2.4 million* of them.

### c.    Amount and Substantiality of the Copyrighted Work Used

The third factor under § 107 requires an inquiry into the amount and substantiality of the copyrighted work used in relation to the copyrighted work as a whole.  The greater the transformative nature of an alleged infringer's work and the less likely it serves as a market substitute for the original, the greater the amount of the original work the infringer may use while still being protected under the fair use defense.  See Campbell, 510 U.S. at 587-89; Nihon, 166 F.3d 65 at 73.  "The inquiry is whether the amount taken is reasonable in light of the purpose of the use and likelihood of market substitution." Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enterprises, Int'l, 533 F.3d 1287, 1314 n. 30 (11th Cir. 2008); see Campbell, 510 U.S. at 586-87.  The amount and substantiality of the copyrighted work used by the infringer is often balanced against the first and fourth fair use factors to determine whether this factor tilts toward a finding of fair use.  See Campbell, 510 U.S. at 586-87 (taking into account the first factor, purpose and character of the use, when evaluating the third factor); Peter Letterese, 533 F.3d at 1314 (weighing the fourth factor, the potential for market harm, when evaluating the third factor).

In the present case, it is not necessary to conduct any balancing test when examining the actions of the alleged infringer because Westlaw has made exact and complete copies of the Class Works.  The "amount and substantiality" of the copying of the original is the maximum possible – 100%.  Therefore, this factor weighs against a finding of fair use in the present case.

### d.      *Effect of the Use Upon Potential Markets*

The fourth factor under § 107 requires an assessment of the effect of the use upon the potential

market for, or value of, the copyrighted work.  An analysis of this factor often involves a balancing test

whereby a court must weigh the public benefit of the use against the adverse effect on the copyright

owner's personal gain.  See MCA, Inc. v. Wilson, 677 F.2d 180, 183 (2d Cir. 1981) ("[W]here a claim

of fair use is made, a balance must sometimes be struck between the benefit the public will derive if the

use is permitted and the personal gain the copyright owner will receive if the use is denied").  Some

courts have analyzed this factor from an economic viewpoint, tipping the scale in favor of fair use when

to do otherwise would result in a market failure.  See Harper & Row, 471 U.S. at 568 n. 9 (1985); 4

Nimmer at § 13.05[A][4].

Regardless of its method of analysis, a court must take into account "whether unrestricted and

widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse

impact on the potential market for, or value of, the plaintiff's present work."  Nimmer at § 13.05[A][4]

(citations omitted).  Market value includes not only the value of the original, but any value that there

may be in derivative works. <u>See</u> <u>Campbell</u>, 510 U.S. at 590.[2]

The dissemination and republication of Class Works could cause several types of market harm to a copyright holder. These harms include, without limitation, the following: (1) harm to any competitive advantage that the attorney may enjoy; (2) harm caused by granting other attorneys an unfair advantage; and (3) harm to any derivative market – if, for example, an attorney wished to compile his or her legal materials and sell them as a package or use the materials to market his or her expertise through articles, books, or seminars.

Attorneys often gain new clients through their successes, word of mouth, and community reputation. An attorney's work product can be a significant factor in the generation of clients. The competitive advantage that results from producing a quality work product can be reduced or negated when other attorneys have the ability to access and use these documents. Harm due to an unfair advantage occurs when an attorney appropriates another's work and is able to charge less, take on more

---

[2]A "derivative work" is defined under 17 U.S.C. § 101 as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which [the original] work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'"

clients, or spend more time focusing on other cases as a result of the infringement.  In its advertising materials, Westlaw explicitly boasts this effect of its infringement as a positive marketing tool.  By saying to its subscribers that they can "[f]ind new ideas and approaches" and "[g]ain a competitive advantage with briefs written by experts," Westlaw is telling attorneys that by paying Westlaw a fee, the attorneys can eliminate the many hours of hard work and the many years of experience that go into composing a high-level legal brief and instead can instead simply copy from the experts.  [Ex. A (Westlaw Promotional Materials)].  In other recent promotional materials, Westlaw is even more brazen:

> Westlaw gives you more than 2.4 million reasons not to reinvent the wheel.

> As one law professor asks, "Why should an attorney spend countless hours researching and writing a brief on a topic that may have already been thoroughly researched and written for a previous lawsuit?" Good question.

> That's why you turn to the 2.4-million-strong briefs collection on Westlaw. Even if your office doesn't have a library of previously done research, you can still retrieve a court-tested brief on your issue in seconds.

[Id.].

Perhaps even more brazen, the "law professor" cited in Westlaw's advertisement is identified as Michael Whiteman, author of Appellate Court Briefs on The Web: Electronic Dynamos or Legal Quagmire?, 97 Law Libr. J. 467 (2005), which is discussed in this Memorandum.  In the same article in which Professor Whiteman asks the question, "Why should an attorney spend countless hours researching and writing a brief on a topic that may have already been thoroughly researched and written for a previous lawsuit?" he also explains how such briefs enjoy copyright protection and that applicable

case law "may (or should) cause private actors concern over whether they should republish portions of briefs." Id. at 479.  Instead of heeding Professor Whiteman's advice, Westlaw has ironically used him as its unwitting spokesman.  From a market perspective, Westlaw is similar to a person who sells stolen A+ tem papers to C+ college students seeking to avoid doing work.  In the case of Westlaw, however, the stakes are much higher because the documents that are being sold by Westlaw are not merely term papers for a class; they are the fruits of a professional's labor and the source of a professional's livelihood.[3]

Westlaw's reproduction may also cause harm to potential derivative markets.  As a copyright owner, an attorney could package his or works, sell the package on the market as an educational, instructional, or functional tool, and enjoy the exclusive rights granted by the Copyright Act.  Undoubtedly, Westlaw's reproduction and dissemination of Class Works would cause significant harm to any such derivative market.  As stated by the Supreme Court in Campbell, "when a commercial use amounts to mere duplication of the entirety of an original, it clearly 'supersede[s] the objects' of the

---

[3] To be clear, the term-paper analogy applies only as to the two sellers of the copied materials and their effects on the markets for their products.  The analogy does not necessarily apply to the *consumers* of those products.  For instance, an inexperienced litigator who wishes to review the work of an expert before crafting his or her own legal brief probably should not be compared to a cheating college student who purchases a term paper on the black market.  But again, the focus for purposes of fair use is not on the use by the end user but on the use by the alleged infringer.  In that context, Westlaw is the same as the black-market term-paper dealer.

original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." Id. at 591(citations omitted).

Westlaw may argue that widespread dissemination of the Class Works may theoretically benefit the public.  For instance, free or affordable access to briefs, motions, and pleadings could reduce costs for clients, promote innovation within the legal field, and possibly provide indigent clients with better representation.  Yet such an argument rests on the assumption that all attorneys will have equal and affordable access to the Class Works within Westlaw's databases.  The evidence in this case will show that Westlaw is a very expensive service, especially with respect to the databases that contain the Class Works.  Due to such expense, Westlaw's databases of attorney-authored documents are unaffordable and inaccessible to many.  Furthermore, Westlaw's pricing structure causes small practitioners and public interest firms to pay more per document.  Subscribers with unlimited access to databases of Class Works are able to access as many documents as they please, effectively driving down the price that they pay per document.  Those attorneys who are unable to purchase unlimited subscriptions and must access documents on a per-document basis will end up paying a higher price per document.

Westlaw's expensive rates are also more likely to raise, rather than suppress, client costs.  Undoubtedly, Westlaw's for-profit distribution of the Class Works is unlikely to yield the benefits that would result from widespread dissemination of such works.  In fact, Westlaw's dissemination of

37

attorney-authored works is likely to increase inequities in the legal field by affording greater legal

resources to wealthier firms.  As Professor Whiteman notes regarding access to briefs:

> Many private database providers (such as Westlaw and LexisNexis) are already placing these
> public documents on their databases and then charging for access to them.  This is a step in the
> wrong direction, taking us back to the days when access to primary legal authority was limited to
> those who had access to a law library or could afford a subscription to one of the computer-
> assisted legal research providers.  Free access to these court documents would help to level the
> playing field between wealthy and not so wealthy litigants that use our federal and state judicial
> systems.

Whiteman, supra, at 483.

Even if Westlaw's for-profit dissemination of the Class Works to selected attorneys and law

firms serves a public purpose, such a purpose does not militate in favor of fair use.  As stated by the

Second Circuit, "[t]he fair use doctrine is not a license for corporate theft, empowering a court to ignore

a copyright whenever it determines the underlying work contains material of possible public

importance."  Iowa State Univ. Research Found., Inc., v. Am. Broad. Cos., 621 F.2d 57, 61-62 (2d Cir.

1980) (finding that the fourth fair use factor weighed against the television network ABC, which

broadcasted portions of a student's film biography on an important public wrestler, even though

evidence showed that the market value of the film increased after the broadcast because "it usurped an

extremely significant market").

Moreover, even if Westlaw's services were not so expensive, Westlaw's actions still would be no

more defensible than those of the copy shop in Princeton Univ. Press v. Mich. Doc. Servs., 99 F.3d 1381

(6th Cir. 1996).  In that case, the copy shop reproduced portions of copyrighted scholarly works, bound the works, and then sold them to students as part of a course packet.  In rejecting a fair use defense, the Sixth Circuit stated: "[I]f the fairness of making copies depends on what the ultimate consumer does with the copies, it is hard to see how the manufacture of pirated editions of any copyrighted work of scholarship could ever be an unfair use."  Id. at 1386 n.2.  Even a person with no financial incentive might cause serious market harm by infringing an original work.  For example, a person with a sincere altruistic motive might decide to photocopy the entirety of a copyrighted textbook and then provide the copies to numerous underprivileged schools at low or no cost.  Despite the obvious public benefit derived from this act, the infringer has created significant market harm to the detriment of the author.

In short, in the case of Westlaw's copying and dissemination of the Class Works, the fourth factor – like each of the first three factors – militates against a finding of fair use.

### G.   Common Applicability of the Above Legal Principles to the Class Works

As stated previously, the above discussion is not intended to be an exhaustive exposition of the plaintiff's argument on the merits.  Rather, the discussion is intended to outline the general principles of law that will apply to Westlaw's alleged infringement of the Class Works.  Westlaw may raise defenses or arguments that are not addressed above.  Nevertheless, the fact is that *all* of the Class Works are of the same general type, and all of them have been copied, displayed, promoted, and used by Westlaw in the same general manner.  All of the Class Works have been reproduced verbatim and have been made

available to the same group of Westlaw subscribers.  Thus, the copyrightability of each of the Class

Works and the potential applicability of any fair use defense will be analyzed in the same manner in

accordance with the legal principles discussed above.

## IV.   RELEVANT HISTORY OF COPYRIGHT CLASS ACTIONS INVOLVING WESTLAW

This class action is a culmination of several recent precedents, including two decisions by the

U.S. Supreme Court and two decisions by the U.S. Court of Appeals for the Second Circuit.  Most of the

relevant decisions are a result of a cluster of litigation that will be referred to herein as the Literary

Works litigation.  As discussed in detail below, the chronology of these decisions creates a clear

roadmap that establishes Heinlein's right to obtain class certification under Rule 23 based on the specific

class definition that is proposed herein.

### A.   *New York Times Co., Inc. v. Tasini*

In 2001, the Supreme Court decided New York Times Co., Inc. v. Tasini, 533 U.S. 483 (2001), a

case brought by freelance authors whose copyrighted articles had been electronically distributed by

LexisNexis, an online subscription service that is substantially similar to Westlaw.[4]  In Tasini, the

authors had authorized the *The New York Times* and other periodicals to publish the authors' works in

specific newspapers or magazines but had not given express authorization to have the works included in

an electronic database.  Despite this lack of consent, *The New York Times* contracted with LexisNexis,

_____

[4] In addition to LexisNexis, Tasini involved two electronic disc-based services known as NYTO and
GPO.

40

which in turn made the articles available in a searchable online database.  The defendants claimed that

LexisNexis had the right to republish the authors' works under 17 U.S.C. § 201(c), which provides as

follows:

> **Contributions to Collective Works**.  Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution.  In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.[5]

Because *The New York Times* held the copyright to its newspapers as "collective works," the

defendants argued that the LexisNexis database was a protected "revision" of a collective work under

§ 201(c) and that *The New York Times* had validly transferred to LexisNexis the right to publish the

revision.  The Supreme Court disagreed, holding that the LexisNexis database is not a revision to a

collective work.

> In determining whether the Articles have been reproduced and distributed "as part of" a "revision" of the collective works in issue, we focus on the Articles as presented to, and perceptible by, the user of the Databases.  In this case, the three Databases present articles to users clear of the context provided either by the original periodical editions or by any revision of those editions.  The Databases first prompt users to search the universe of their contents: thousands or millions of files containing individual articles from thousands of collective works (*i. e.,* editions), either in one series (the Times, in NYTO) or in scores of series (the sundry titles in NEXIS and GPO).  When the user conducts a search, each article appears as a separate item

---

[5] Under 17 U.S.C. § 101, a "collective work" is defined as "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole."

> within the search result.  In NEXIS and NYTO, an article appears to a user without the graphics, formatting, or other articles with which the article was initially published. In GPO, the article appears with the other materials published on the same page or pages, but without any material published on other pages of the original periodical. In either circumstance, we cannot see how the Database perceptibly reproduces and distributes the article "as part of" either the original edition or a "revision" of that edition.

Tasini, 533 U.S. at 499-500.

The Tasini Court further explained that in determining whether a database such as LexisNexis can be considered a collective work, it is irrelevant how the original works are actually transferred from the author to the print publisher or from the print publisher to the online publisher.  Rather, all that matters is that the original works were not presented to the consumer as a collective work or a revision thereof.  Id. at 513 n.9.  Affirming the decision of the Second Circuit, the Supreme Court ruled in favor of the authors in Tasini.

Tasini is important to the present action for at least three reasons:  First, the Supreme Court's holding defeats any possible claim by Westlaw that its database of Class Works is a collective work or a revision of a collective work.  This is important because, as discussed in Section III above, Westlaw's databases contain the Class Works in their entirety and are not "transformative" in any way.  Thus, the most obvious possible defense to an aggregation of verbatim copying – the "collective work" defense – is unavailable to Westlaw as a matter of law.  In Tasini, unlike in the present case, the online publisher (LexisNexis) actually had a license from a valid copyright owner (The New York Times), yet that was

still insufficient to permit the online publisher to include the individual copyrighted articles within its database.

Second, Tasini is important because the Court rejected LexisNexis's argument that online subscription services should be compared to other media-playing equipment – such as VCRs or digital video recorders – whose manufacturers are not liable for the "sale of copying equipment" if the equipment is "capable of substantial noninfringing uses."  Id. at 504 (quoting Sony Corp. of America v Universal City Studios, Inc., 464 U.S. 417, 442 (1984)).  As held by the Court: "The Electronic Publishers [including LexisNexis] are not merely selling 'equipment'; they are selling copies of the Articles.  And, as we have explained, it is the copies themselves, without any manipulation by users, that fall outside the scope of the § 201(c) privilege."  Tasini, 533 U.S. at 504.

Third, Tasini is important because it paved the way for In re Literary Works in Electronic Databases Copyright Litigation, MDL Docket No. 1379.  The case of Literary Works is crucial to the issues of class representation that are at the heart of Heinlein's Motion for Class Certification.

**B.      _In re Literary Works in Electronic Databases Copyright Litigation_**

Following the Second Circuit's decision in Tasini, several other freelance authors filed actions against Westlaw, LexisNexis, and other online publishers.  After the Supreme Court affirmed the Second Circuit's decision, the various related cases were consolidated in the Southern District Court of New York by the Judicial Panel on Multidistrict Litigation.  Thereafter, the matter proceeded as a single

class action under the MDL Docket Name <u>In re Literary Works in Electronic Databases Copyright</u> <u>Litigation</u>, MDL No. 1379.  After several years of negotiation and mediation, the parties in <u>Literary</u> <u>Works</u> reached a settlement, which then led to the following judicial decisions: a District Court decision approving the settlement; a Second Circuit decision vacating the settlement on jurisdictional grounds; a Supreme Court decision reversing the Second Circuit's decision and remanding the case to the Second Circuit; and a Second Circuit decision vacating the settlement on non-jurisdictional grounds.

### 1.     Approval of Settlement Agreement by Southern District of New York

On September 27, 2005, the District Court for the Southern District of New York (Daniels, U.S.D.J.) issued an order certifying the class and approving a settlement of the class action in <u>Literary</u> <u>Works</u>.  [Ex. D (<u>Literary Works</u> District Court Order); Ex. E (Settlement Agreement)].  Pursuant to the approved settlement, Westlaw and other online database defendants agreed to pay up to $18 million to the class members, plus approximately $4.4 million in attorneys' fees.  Each claimant's recovery from the settlement fund was based on a formula that took into account certain specific factors, including the work's original sale price and whether the class member registered the work with the Copyright Office.  Under the settlement agreement, money was paid for all registered and unregistered works within the class, but those who registered their works received a larger recovery than those who did not register their works.  The settlement agreement also included certain releases for future publication.

The settlement agreement and corresponding court order in <u>Literary Works</u> are important to the present action for at least three reasons:  First and foremost, the District Court's order included a consensual finding of class certification.  Therefore, Westlaw's agreement to this order is an express acknowledgment by Westlaw – indeed, a judicial admission – that a class action is an appropriate mechanism to address infringement claims by authors of documents included in the Westlaw database. Westlaw agreed, and the District Court so found, that all of the prerequisites of Rule 23 had been satisfied.  In <u>Literary Works</u>, unlike in the present case, there were multiple database operators that published the works online, as well as multiple print publishers that licensed the works to the database operators.  Thus, in <u>Literary Works</u>, there was certainly less typicality and commonality than in the present case, where there is only one database operator and there are no intermediary publishers that were in privity with individual class members.

Second, the approved settlement agreement in <u>Literary Works</u> is also an acknowledgment by Westlaw that both registered and unregistered authors are entitled to receive damages as part of a settlement.

Third, it is important to note that the class in <u>Literary Works</u> does *not* include any of the proposed Class Works in the present case, because the Class Works were not sold or licensed to any print publisher.  Rather, the Class Works were published directly by Westlaw.  The members of Heinlein's proposed class never granted any rights to a publisher, nor did they receive any compensation

from a publisher.  The Complaint and the Notice of Class Settlement in <u>Literary Works</u> make clear that

documents such as the Class Works were not contemplated within the class in that case.[6]

### 2.      Second Circuit Decision Vacating the Settlement Agreement

Despite the fact that the parties reached a settlement in <u>Literary Works</u>, the agreement was

challenged by certain unregistered authors who objected to the formula contained in the proposed

distribution.  Among other things, the authors objected on the grounds that their claims were

inadequately compensated relative to the claims of registered authors.   <u>In re Literary Works in</u>

<u>Electronic Databases Copyright Litigation</u>, 509 F.3d 116,120 (2d Cir. 2007).  In response, Westlaw and

other defendants argued that the unregistered works were less valuable because the District Court "lacks

jurisdiction … to certify a class covering any unregistered works." <u>Id.</u> at 119.  Nevertheless, "[t]he

District Court never considered whether it had jurisdiction to certify a class consisting mostly of claims

arising from unregistered copyrights, or to approve a settlement resolving those claims." <u>Id.</u> at 120.

Instead, the District Court overruled the objections and approved the settlement.

The objectors appealed the District Court's decision approving the settlement agreement on the

grounds of unfairness to the unregistered authors and inadequacy of representation.  <u>Id.</u>  Prior to hearing

---

[6] The Notice of Class Action Settlement describes the claim and the class as follows: "The lawsuit asserts that after freelance authors' works were published in newspapers, magazines and other print publications with the authors' permission, those publications then licensed the works without the authors' permission to the commercial databases for electronic publication, in violation of the copyright laws."  [Ex. F (<u>Literary Works</u> Notice of Class Action Settlement)].

the appeal, the Second Circuit addressed the obvious illogic of the position taken by Westlaw and its co-defendants.  Indeed, it made no sense that the District Court could possess jurisdiction over unregistered claims for the purpose of approving a settlement of those claims, yet the District Court could then devalue those claims in the settlement based on the theory that there was *no* jurisdiction over the claims. Accordingly, the Second Circuit issued a *sua sponte* order requesting briefing on the jurisdictional issue. Despite the fact that all parties argued for jurisdiction, the Second Court concluded that the District Court lacked jurisdiction to consider the claims of unregistered works and therefore lacked jurisdiction to certify the class and approve the settlement agreement.  Id. at 128.

The Second Circuit's reasoning in Literary Works was based on 17 U.S.C. § 411(a), which provides in relevant part that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made."  The Second Circuit concluded that this provision was jurisdictional in nature and that the District Court therefore did not have jurisdiction to consider class claims related to unregistered works, regardless of whether there was a settlement and regardless of whether the named plaintiffs had registered their own works.  509 F.3d at 121-27.  As a result of this conclusion, the Second Circuit did not review the fairness of the settlement or the certification of the class.

47

### 3.      Supreme Court Decision

The Second Circuit's decision in <u>Literary Works</u> was reviewed by the Supreme Court in <u>Reed Elsevier v. Muchnick</u>, __ U.S. __, 130 S.Ct. 1237 (2010).  In <u>Muchnick</u>, the Supreme Court reversed the decision of the Second Circuit and held that the registration requirement under 17 U.S.C. § 411(a) is merely a "precondition to suit" and is *not* jurisdictional in nature.  <u>Id.</u> at 1247.  In so holding, the Supreme Court relied on <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385 (1982), a case in which the Court held that "Title VII's requirement that sex-discrimination claimants timely file a discrimination charge with EEOC before filing a civil action in federal court was nonjurisdictional."  <u>Muchnick</u> at 1246.  The Court explained that "[a] statutory condition that requires a party to take some action before filing a lawsuit is not automatically 'a *jurisdictional* prerequisite to suit.'"  <u>Id.</u> at 1246 (<u>quoting</u> <u>Zipes</u>, 455 U.S. at 393).  Just as an EEOC filing is a nonjurisdictional prerequisite to filing a discrimination lawsuit, so too is the registration of a copyright a nonjurisditional prerequisite to filing an infringement lawsuit.  <u>Muchnick</u> at 1246-47.

The Supreme Court's decision in <u>Muchnick</u> is relevant to the present action for one very important reason:  The Supreme Court's holding that the registration requirement under 17 U.S.C. § 411(a) is a mere nonjurisdictional prerequisite to suit necessarily means that the claims of unregistered authors can be adjudicated in a class action as long as the class representative has obtained registration of his or her own work prior to filing suit.  This principle is based on <u>Zipes</u> and its progeny, which

provide that when a cause of action has a nonjurisdictional prerequisite to suit, the fulfillment of the prerequisite by the class representative is sufficient to satisfy the prerequisite as to the claims of *all* class members, regardless of whether the individual class members have separately fulfilled the prerequisite. <u>Zipes</u> and its progeny are discussed in detail in Section IV below.

### 4.    Second Circuit Decision on Remand

In vacating the Second Circuit's decision regarding jurisdiction, the Supreme Court remanded the case to the Second Circuit to determine the merits of the settlement agreement.  On remand, the Second Circuit addressed the objections to the settlement agreement, including the objection that authors of unregistered works had been inadequately represented and had unfairly received less compensation than the authors of registered works.  <u>In re Literary Works in Electronic Databases Copyright Litigation</u>, 654 F.3d 242 (2d Cir. 2011).  The Second Circuit held that although it was not necessarily unfair to compensate unregistered works less favorably than registered works, the relative value of unregistered works in comparison to registered works could not be reliably assessed in the absence of independent representation for each category of claims.  <u>Id.</u> at 253.

Under the settlement agreement and corresponding class certification order in <u>Literary Works</u>, all claims were considered part of a single class; but within that class, there were three distinct "categories" of claims.  The categories were presumably based on the types of judicial remedies that might have been

available to each claimant had he or she independently initiated an infringement action.  The Second

Circuit described these categories as follows:

> Category A covers works that authors registered with the U.S. Copyright Office in time to be
> eligible for statutory damages and attorney's fees under the Copyright Act. <u>See</u> 17 U.S.C. § 412
> [generally allowing for the recovery of defined statutory damages and attorney's fees under 17
> U.S.C. §§ 504 and 505 if the work is registered within three months after its first publication].
> … Category B includes works that authors registered before December 31, 2002, but too late to
> be eligible for statutory damages.  These claims are eligible to recover only actual damages
> suffered by the author and any profits of the infringer that are not duplicative of the actual
> damages. 17 U.S.C. § 504(b). All other claims fall into Category C and cannot be litigated for
> damages purposes unless they are registered with the Copyright Office. 17 U.S.C. § 411(a). If
> registered, however, these claims—like those in Category B—would be eligible for awards based
> on authors' actual damages and infringers' profits. Category C claims comprise more than 99%
> of authors' total claims. Many authors hold claims in more than one category, each claim based
> on a separate freelance article they sold for publication.

<u>Id.</u> at 246.

The Court held that the inherent differences among the three categories of claims prevented those

claims from being certified and settled as a single class:

> We agree with objectors that the interests of class members who hold only Category C claims
> fundamentally conflict with those of class members who hold Category A and B claims.
> Although all class members share an interest in maximizing the collective recovery, their
> interests diverge as to the distribution of that recovery because each category of claim is of
> different strength and therefore commands a different settlement value. Named plaintiffs who
> hold other combinations of claims had no incentive to maximize the recovery for Category C-
> only plaintiffs, whose claims were lowest in settlement value but eclipsed all others in quantity.
> The interests of Category C-only plaintiffs could be protected only by the formation of a subclass
> and the advocacy of independent counsel. We therefore hold that the district court abused its
> discretion in certifying the class based on its finding that class representation was adequate.

<u>Id.</u> at 254-55.

The Court thereupon remanded the case to the District Court with directions to create three subclasses of claims.  Id. at 257.  The plaintiffs and defendants sought an *en banc* rehearing of the Second Circuit's decision, but the petitions were denied on November 17, 2011.  The matter is presently pending in the District Court for the Southern District of New York.

The 2011 Second Circuit decision in <u>Literary Works</u> stands for the proposition that in a class action for copyright infringement, a class cannot be defined as including both registered works and unregistered works, nor can a class include both registered works that would qualify for attorneys' fees and statutory damages and registered works that would *not* qualify for attorneys' fees and statutory damages.  The 2011 Second Circuit decision indicates that there is a conflict among the three types of claims, which may be resolved by either creating subclasses with independent representation or limiting a class action to one category of claim.  The Court made clear, however, that it would be permissible for a class representative to hold claims in more than one category and therefore be a *member* of multiple subclasses, as long as the individual served as a *representative* of only one subclass.  Id. at 257.

In addition to the central holding of the Court as described above, the 2011 Second Circuit decision is equally important for what it did *not* say.  Specifically, the Court did not say that unregistered works could not be represented in a class action, despite their failure to have been registered.  Rather, the Court's decision assumes that the unregistered works *can* and *will* be litigated and/or settled, provided that they are represented by an adequate class representative.  Since obtaining copyright

registration is a prerequisite for a plaintiff to file suit, the representative plaintiff for unregistered works would need to have at least one registered work.  Thus, the Second Circuit's 2011 decision implicitly recognizes the adequacy of such representation.  This type of class representation is consistent with, and is indeed dictated by, <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385 (1982) and its, which are discussed in detail in Section V below.[7]

### C.    *Waldman v. Thomson Reuters Corp.*

On May 25, 2010, Lorne Waldman, a Canadian attorney, brought an action against Thomson Reuters Canada Limited, an entity affiliated with West Publishing Corporation.  Waldman claimed that Thomson's "Westlaw Canada" service had impermissibly published court pleadings and other attorney-authored documents filed in Canadian courts.  Waldman moved to certify the class, to which Westlaw asserted numerous objections.  On February 21, 2012, in a thorough opinion, the Ontario Superior Court of Justice granted the plaintiff's motion and certified the class over Westlaw's objections.  <u>Waldman v.</u>

---

[7] Interestingly, the 2011 Second Circuit decision in <u>Literary Works</u> does not directly address the principle of representative fulfillment of non-jurisdictional preconditions to suit as recognized in <u>Zipes</u> and as implicitly applied to copyright class actions in <u>Muchnick</u>.  Nevertheless, the underlying premise of the parties' failed settlement agreement in <u>Literary Works</u> – namely, the assumption that the claims of unregistered works are worth less than the claims of works that were registered too late to qualify for statutory damages and attorneys' fees – no longer makes any sense in light of the Supreme Court's <u>Muchnick</u> decision applying <u>Zipes</u> to the registration requirement of § 411(a).  To the extent that the 2011 Second Circuit decision in <u>Literary Works</u> is interpreted as assuming some validity to the differences in valuation as between "Category 2" claims and "Category 3" claims, such an assumption is inconsistent with <u>Muchnick</u> and <u>Zipes</u>, as discussed in more detail in Section V below.

Thomson Reuters Corporation, 2012 ONSC 1138 (CanLII).  [Ex. G (<u>Waldman</u> Class Certification Order)].

The class certification order in <u>Waldman</u> reveals that the relevant facts are substantially similar to the facts in the present case.  The order also reveals some differences between American copyright law and Canadian copyright law, the latter of which does not require registration as a prerequisite to suit.  Nevertheless, the <u>Waldman</u> decision examines many of the same types of certification questions that are relevant to class certification under Rule 23, including commonality of issues and superiority of judicial procedure.  On these points, the court held that although there may be complex issues relating to individual works within the class, including ownership and copyrightability, those issues could be appropriately handled within the context of a class action and therefore did not make such an action undesirable or unmanageable.

### D.     *White* and *Heinlein* Cases

The plaintiff in the present case, David J. Heinlein, is a resident of Connecticut and a member of the Connecticut bar.  In early 2010, Attorney Heinlein and his Connecticut attorneys (collectively, the "Heinlein Group") became aware of the enormity and apparent illegality of the above-described infringement by Westlaw.  Thereafter, the Heinlein Group spent over two years investigating, researching, and analyzing the factual and legal issues relating to Westlaw's practices.  This analysis necessarily included monitoring the various court decisions in <u>Literary Works</u>.  Shortly after the Second

Circuit's denial of the *en banc* petitions in <u>Literary Works</u>, on January 17, 2012, Heinlein obtained copyright registration for one of his works that was displayed on Westlaw.  Thereupon, on March 14, 2012, Heinlein initiated this class action in the District of Connecticut alleging that West had improperly infringed the work of Heinlein and others similarly situated.

Shortly after Heinlein obtained his copyright registration, but before he initiated his lawsuit, a similar action was initiated in the District Court for the Southern District of New York on behalf of two attorneys, Edward White and Kenneth Elan (collectively, the "White Group").  <u>White v. West Publishing Corp.</u>, 1:12-01340-JSR.  The case was filed on February 22, 2012 and was assigned to the Honorable Jed S. Rakoff.  Many of the issues raised in <u>White</u> are substantially similar to the issues raised in the <u>Heinlein</u> case.  Unlike in <u>Heinlein</u>, however, the claims in <u>White</u> are against not only Westlaw but also LexisNexis.

The Heinlein Group was completely unaware of the existence of the White Group or its plans to initiate the White litigation.  In fact, the Heinlein Group went to file its complaint believing that it would be the first such case in the United States.  Likewise, it is assumed that the White Group was completely unaware of the existence of the Heinlein Group and its plans to initiate the Heinlein litigation.

On April 5, 2012, the Heinlein Group filed a motion with the Judicial Panel for Multidistrict Litigation (the "MDL Motion") seeking to transfer <u>White</u> to the District of Connecticut for consolidated or coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the MDL Panel Rules

of Procedure.  When the MDL Motion was filed, there had not been any responsive pleadings or responsive motions filed in either White or Heinlein, nor had there been any discovery, scheduling conferences, or scheduling orders (other than general standing orders).  Subsequent to the filing of the MDL Motion, there has been some activity in the cases.  The White Group, Westlaw, and LexisNexis have all filed objections to the MDL Motion, arguing that the cases should not be consolidated.[8]   The MDL Motion is currently pending before the MDL Panel under MDL Docket No. 2367 and is scheduled for a hearing in Washington, D.C. on May 31, 2012.

Despite the many obvious similarities between Heinlein and White, there have been developments since the filing of the MDL Motion that indicate a very important difference between the two cases.  Specifically, it has become apparent that the plaintiffs in White only possess the legal ability to pursue claims for *registered* works and do *not* have the right to pursue claims relating to unregistered works.  By contrast, Heinlein possesses the legal ability to pursue claims of both registered *and* unregistered works, but he seeks only to pursue claims of other authors who have unregistered works, as authorized by Reed Elsevier v. Muchnick, __ U.S. __, 130 S.Ct. 1237 (2010) (discussed in Section IV.B.3 above) and Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982)(discussed in Section V below).  While it is presently unclear whether this difference between the two plaintiff groups will have

---

[8] In addition to its opposition to multidistrict litigation, LexisNexis also claims that the White case should be severed as between Westlaw and LexisNexis due to alleged differences in the publishing practices of the two defendants.

an effect on the disposition of the MDL Motion, it is quite clear that the proposed class defined by Heinlein in this case does not overlap in anyway with any class that is being pursued, or could be pursued, in <u>White</u>.

In <u>White</u>, unlike in Heinlein, the complaint specifies two distinct subclasses:  first, a subclass of registered works represented by plaintiff White, a registered author; and second, a separate subclass of *unregistered* works represented by plaintiff Elan, an *unregistered* author.  [Ex. H (White Complaint) at ¶¶ 4, 5 & 12].  The <u>White</u> complaint makes clear that Attorney White has filed suit solely as a proposed representative plaintiff for registered works and Attorney Elan has filed suit solely as a proposed representative for unregistered works.  [<u>Id.</u>].

On April 6, 2012, Westlaw and LexisNexis filed motions to dismiss Elan's claims under Rule 12(b)(6) based on Elan's failure to obtain copyright registration prior to filing suit, as required under 17 U.S.C. § 411(a).  Section 411(a) unambiguously states that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made."  Although the Supreme Court held in <u>Reed Elsevier v. Muchnick</u>, __ U.S. __, 130 S.Ct. 1237 (2010), that § 411(a) was non-jurisdictional (and therefore waivable), the Supreme Court nevertheless made clear that the requirement was a "precondition to suit."  <u>Id.</u> at 1247.  When Westlaw filed its motion to dismiss on April 6, 2012, it became clear that Westlaw would *not* waive the registration requirement for Elan.  Thus, the <u>White</u> complaint, as presently stated, could not

possibly be interpreted as setting forth a valid cause of action on behalf of unregistered works. The complaint therefore required dismissal as to plaintiff Elan and his purported subclass.

On April 12, 2012, several days after the filing of motions to dismiss by Westlaw and LexisNexis in White, the plaintiffs' counsel filed a proposed Civil Case Management Plan, which was adopted in its entirety and issued as an order of the Court on April 16, 2012. [Ex. I (White Case Management Order)]. Under the agreed-upon Order, the plaintiffs were allowed until April 27, 2012 to file amended pleadings without leave of Court. Thus, at any time prior to April 27, 2012, the plaintiffs could have amended their complaint in an attempt to address the obvious fatal defect that existed with respect to unregistered works. The plaintiffs decided *not* to amend their complaint and instead filed a Memorandum in Opposition to Motion to Dismiss on April 26, 2012. In their memorandum, the plaintiffs did not argue – nor could they – that they had properly stated a damages claim on behalf of unregistered works. Rather, the plaintiffs argued that they had properly stated a claim for injunctive and declaratory relief only, because, according to the plaintiffs, 17 U.S.C. § 411(a) only applies to claims for damages, not injunctive or declaratory relief. In the alternative, the plaintiffs also requested leave to amend as an alternative to partial dismissal; but the plaintiffs did not specifically state how they would amend the complaint or whether the undefined proposed future amendment would include claims for damages or only injunctive and declaratory relief.

With due respect to the plaintiffs and counsel in <u>White</u>, with whom Heinlein and his counsel share obvious agreement as to many aspects of these similar cases, the fact is that § 411(a) unambiguously prohibits a plaintiff from bringing *any* infringement action – regardless of the relief sought – unless and until registration has been obtained.  The plaintiffs' position in <u>White</u> regarding the pending motion to dismiss is simply unsupportable.  Moreover, the recent decisions in <u>Literary Works</u>, including <u>Reed Elsevier v. Muchnick</u>, __ U.S. __, 130 S.Ct. 1237 (2010), and the subsequent Second Circuit decision, when combined with <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385 (1982), should have made clear to any plaintiff contemplating a copyright class action that the only way to pursue any class claims relating to unregistered works is to obtain registration prior to filing suit.

In light of the above, it is apparent that Heinlein is the only proposed class representative in either of the two cases who has stated a cause of action on behalf of unregistered works.  Elan purports to represent unregistered works, but his failure to register means that his claims are defective and will be dismissed.  White is registered, but he seeks only to represent other registered works.  Even if Elan is correct that he somehow has the right to seek declaratory and injunctive relief as to unregistered works, Elan admits that he has no basis to pursue monetary damages for such works.  Therefore, certification of a class in the present case is necessary, at least insofar as damages for unregistered works are concerned.

Unlike in <u>White</u>, Heinlein's proposed class action completely steers clear of the conflict of interest identified by the Second Circuit in its 2011 decision in <u>Literary Works</u>.  654 F.3d at 254-55.

Specifically, Heinlein's copyright registration was not obtained within three months after the first publication of his subject work.  Therefore, under 17 U.S.C. § 412, Heinlein has no right to seek statutory damages or attorneys' fees authorized by 17 U.S.C. §§ 504 and 505.  Also, in his affidavit attached hereto, Heinlein has expressly stated that he will seek the same type of damages award as other class members and will neither seek nor accept any greater award or settlement that is based solely on his obtaining registration.  [Ex. B (Heinlein Affidavit) at ¶ 15].[9]  Thus, all claims within the class will be treated equally, thereby eliminating the types of conflict that concerned the Second Circuit in <u>Literary Works</u>.[10]

---

[9] Although Heinlein does not seek attorneys' fees in addition to damages, plaintiff's counsel reserves the right to seek approval of compensation as a portion of total damages recovered on behalf of a certified class, and/or as otherwise agreed upon in any settlement that is submitted for approval.  Also, although Heinlein does not seek any greater award or settlement that is based solely on his obtaining registration, he reserves the right to seek compensation based on time and expenses incurred as a class representative in the litigation.  <u>See, e.g.</u>, <u>Roberts v. Texaco, Inc.</u>, 979 F.Supp. 185, 200 (S.D.N.Y. 1997); <u>In re American Intern. Group, Inc. Securities Litigation</u>, No. 04 Civ. 8141(DAB), 2012 WL 345509, at *6 (S.D.N.Y. Feb. 2, 2012).

[10] Even if White and/or Elan somehow are able to avoid a conflict of interest and state a cause of action against LexisNexis on behalf of unregistered works, it would still be appropriate to certify Heinlein's class as against Westlaw.  There is no reason the two competing online publishers need to be defendants in the same case; and in fact, LexisNexis, like Heinlein, agrees that they should *not* be defendants in the same case.  Certifying Heinlein's class as against Westlaw will not in any way prejudice White or Elan, nor will it restrict their freedom to choose how they wish to pursue claims against LexisNexis.

## V.     REPRESENTATIVE FULFILLMENT OF NON-JURISDICTIONAL PRECONDITIONS TO SUIT BY CLASS REPRESENTATIVES

The current version of Rule 23 of the Federal Rules of Civil Procedure owes itself significantly to the 1966 Amendments, which, among other things, created "criteria that must be met for a class to be certified" and also "permitt[ed] judgments for money that would bind all class members save those who opt out." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 592 (1997).  Despite clarity in many areas, neither the 1966 revisions nor any subsequent revisions specifically address whether, and to what extent, a class representative may satisfy procedural and substantive litigation requirements on behalf of unnamed members of the class.  This issue was first addressed by the Supreme Court in American Pipe & Const. Co. v. Utah, 414 U.S. 538  (1974), a case that considered the interplay between Rule 23 and statutes of limitation.  There is nothing in Rule 23 or elsewhere that addresses whether the filing of a proposed class action prior to the expiration of the applicable statute of limitation relieves members of the class from individually satisfying the statute if it expires prior to a class certification order.  Since a class does not truly exist until certified by the court, one might argue that the mere filing of a proposed class action is insufficient to fulfill this precondition on behalf of an entire class.  Nevertheless, requiring members of a proposed class to file their own lawsuits or join as named plaintiffs would thwart the purpose of a class action.  Id. at 551.  Accordingly, the Supreme Court held that "the filing of a timely class action complaint commences the action for all members of the class as subsequently determined." Id. at 550.

60

Following <u>American Pipe</u>, the Supreme Court has addressed other procedural requirements that may be satisfied solely by a class representative on behalf of an entire class.  In <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405 (1975), the Supreme Court addressed the requirement of filing a discrimination charge with the EEOC prior to initiating a Title VII action in court.  <u>See</u> 42 U.S.C. § 2000e-5.  In a class action alleging discrimination, the Court held that the filing of a timely charge with the EEOC by a single aggrieved individual was sufficient to satisfy the precondition to suit on behalf of the entire class, thus permitting the recovery of backpay not only for the class representative but for all unnamed members of the class who did not file a charge with the EEOC.  422 U.S. at 414 n.8.  The Court later reaffirmed this holding in <u>Franks v. Bowman Transportation Co.</u>, 424 U.S. 747, 771 (1976).

One day after the decision in <u>Albemarle</u>, the Supreme Court decided another case involving administrative preconditions to class actions.  In <u>Weinberger v. Salfi</u>, 422 U.S. 749 (1975), a class action challenged the constitutionality of a federal statute that prohibited the receipt of Social Security insurance benefits by surviving spouses and step-children in certain situations.  The Court analyzed 42 U.S.C. § 405(g), which authorized judicial review of final administrative decisions by the Department of Health, Education and Welfare (now the Department of Health and Human Services).  The class representatives timely sought and obtained the requisite administrative decision.  They then filed suit in district court on behalf of themselves as well as other similarly situated class members who had not availed themselves of the required administrative procedures.   The Court concluded that seeking and

obtaining an administrative decision were "central to the requisite grant of subject-matter jurisdiction – the statute empowers district courts to review a particular type of decision by the Secretary, that type being those which are 'final' and 'made after a hearing.'" Id. at 764.  The Court therefore held that the district court had jurisdiction over the claims of the named plaintiffs but not the unnamed class members.

In Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982), the Supreme Court brought together the various strands of American Pipe, Albemarle, Salfi, and Franks by specifically articulating that the reason for allowing the class representatives in Albemarle and Franks to satisfy an administrative precondition to suit on behalf of an entire class was because the applicable statutory precondition was non-jurisdictional.  As explained by the Court: "If the timely-filing requirement were to limit the jurisdiction of the District Court to those claimants who have filed timely charges with the EEOC, the District Courts in Franks and Albemarle would have been without jurisdiction to adjudicate the claims of those who had not filed as well as without jurisdiction to award them seniority. We did not so hold." Zipes, 455 U.S. at 397.

As a result of American Pipe, Albemarle, Salfi, Franks, and Zipes, the law became clear regarding the ability of a class representative to satisfy preconditions to suit on behalf of unnamed members of a class:  If the precondition is jurisdictional, then each class member must separately satisfy

the precondition; but if the precondition is *non*-jurisdictional, then the class representative's satisfaction of the precondition is sufficient to litigate the claims of all class members.

In Francis v. City of New York, 235 F.3d 763 (2d Cir. 2000), the Second Circuit adopted a broad reading of the Zipes holding: "Zipes' reasoning strongly suggests that the non-jurisdictional status of timeliness requirements reflects the rule, not the exception." Id. at 767.  The Francis Court described the Zipes rule as "the 'single filing rule,' which waives exhaustion requirements for plaintiffs whose claims arise out of the same discriminatory acts as those alleged by a complainant who properly exhausted his administrative remedies." Id. at 767.

In Menominee Indian Tribe of Wisconsin v. U.S., 614 F.3d 519 (C.A.D.C. 2010), the D.C. Circuit discussed Albemarle and American Pipe, explaining that jurisdictional preconditions to suit must be satisfied by each member of the class, whereas *non-jurisdictional* preconditions, such as the exhaustion of non-jurisdictional administrative remedies, need only be satisfied by one member of the class.

> A party generally must exhaust administrative remedies before seeking relief in federal court. See McCarthy v. Madigan, 503 U.S. 140, 144–45, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); see also Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938). That rule "applies to class actions," in which courts typically require "exhaustion by at least one member of the class." Phillips v. Klassen, 502 F.2d 362, 369 (D.C.Cir.1974); see, e.g., Albemarle Paper Co. v. Moody, 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Where exhaustion is a jurisdictional requirement, however, every class member must exhaust its administrative remedies. Blackmon–Malloy v. U.S. Capitol Police Bd., 575 F.3d 699, 704–05 (D.C.Cir.2009); see, e.g., Weinberger v. Salfi, 422 U.S. 749, 764, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

614 F.3d. at 526.

In Reed Elsevier v. Muchnick, __ U.S. __, 130 S.Ct. 1237 (2010), the Supreme Court was faced with the key question under 17 U.S.C. § 411(a):  Is obtaining a copyright registration a *jurisdictional* prerequisite to bringing an infringement action in district court?  Relying specifically on Zipes, the Supreme Court said no.  130 S.Ct. at 1246-47.  As in Zipes, the plaintiff in Muchnick sought to represent a class of unnamed plaintiffs, the majority of whom had not satisfied the non-jurisdictional precondition to suit.  Thus, as in Zipes, the consequence of the Court's characterization of the applicable precondition was clear and significant:  By holding that the act of obtaining copyright registration from the Copyright Office is the procedural equivalent of filing a discrimination charge with the EEOC, Muchnick thereby confirmed that a plaintiff who obtains copyright registration under 17 U.S.C. § 411(a) can pursue claims on behalf of class members who have not themselves obtained registration.

The Supreme Court's decision in Muchnick reversed the Second Circuit's 2007 decision in Literary Works.  509 F.3d 116.  Yet even in the decision that was reversed, the Second Circuit recognized the applicable jurisdictional/non-jurisdictional dichotomy that had been established by the Supreme Court for determining whether all class members are required to satisfy a statutory precondition to suit.  In Literary Works, the Second Circuit opined that the registration requirement of § 411(a) was more like the requirement in Salfi and therefore was a jurisdictional requirement that needed to be satisfied by each individual class member.  Literary Works, 509 F.3d at 125-26.  In

overturning the Second Circuit's decision, the Supreme Court concluded that § 411(a) was not like the applicable requirement in Salfi and instead was like the non-jurisdictional requirement in Zipes.

As argued by **Westlaw** in advocating for the adjudication of unregistered works in a copyright class action:

> [I]f a plaintiff brings a single claim based on a registered copyright, the district court acquires jurisdiction over any and all related copyright claims, even if those other claims arise from unregistered copyrights. … "§ 411(a) is merely the plaintiff's ticket to court," that once stamped, allows him to raise all sorts of claims arising from unregistered copyrights.

In re Literary Works in Electronic Databases Copyright Litigation, 509 F.3d 116, 123 (2d Cir. 2007) (quoting the brief of Westlaw and its co-defendants).

No truer words have ever been spoken by Westlaw.  Indeed, it makes perfect sense that § 411(a) would be considered a non-jurisdictional requirement that need only be satisfied by a named plaintiff on behalf of the class.  Unlike the statute considered in Salfi, § 411(a) is not a statute that creates initial jurisdiction in an administrative tribunal and then creates appellate jurisdiction in the district court as a reviewer of an administrative decision.  Rather, by its very terms, the sole result of registration is the ability to bring an infringement directly in district court.  Infringement actions do not seek review of any administrative agency decision, nor is the administrative agency a party to the case. In fact, in comparison to investigative and adjudicative administrative authority that is triggered by the filing of a discrimination charge with the EEOC under 42 U.S.C. § 2000e-5, the role of the Copyright Office in responding to an application for registration under § 411(a) is ministerial in nature.  The role is

nothing more than "punching a ticket to court," to use Westlaw's terminology.  For this reason, § 411(a)

presents an even more compelling and intuitive case for allowing the representative fulfillment of a

precondition to suit, thus making the Supreme Court's decision in <u>Muchnick</u> unsurprising.

## VI.    STANDARD FOR CLASS CERTIFICATION UNDER RULE 23

In light of the above, Heinlein submits that this proposed class action satisfies the requirements

of a class action under Rule 23.  Under Rule 23(c)(1)(A), "the court must determine by order whether to

certify the action as a class action … [a]t an early practicable time after a person sues or is sued as a

class representative."  In the present case, paragraph 3 of the Court's Order on Pretrial Deadlines entered

on March 14, 2012 requires that "[a]ll motions relating to … class certification ... shall be filed within 60

days after filing of the complaint."  The plaintiff has complied with this deadline.

Below is a discussion of each element required in order to obtain class certification under

Rule 23.

### A.    General Prerequisites Under Rule 23(a)

Rule 23(a) sets forth the general prerequisites for obtaining class certification.  These four

prerequisites are as follows:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)      the representative parties will fairly and adequately protect the interests of the class.

This Court has recently discussed these prerequisites in <u>Maziarz v. Housing Authority of the Town of Vernon</u>, No. 3:10-CV-2029, 2012 WL 638681 at *7-9 (D. Conn. Feb. 27, 2012) (Hall, J.).

### 1.      Numerosity

In <u>Maziarz</u>, this Court explained the numerosity requirement of Rule 23(a)(1) as follows:

When determining the practicability of joinder, relevant considerations include judicial economy, geographic dispersion of class members, financial resources of class members, claimants' ability to institute individual suits, and "requests for prospective injunctive relief which would involve future class members." <u>See</u> <u>Robidoux v. Celani</u>, 987 F.2d 931, 936 (2d Cir.1993). Generally, numerosity is presumed when a proposed class includes at least forty members. <u>See</u> <u>Consol. Rail Corp. v. Town of Hyde Park,</u> 47 F.3d 473, 483 (2d Cir.1995).

<u>Maziarz</u>, 2012 WL 638681 at *8.

In the present case, numerosity is clearly established by Westlaw's own promotional materials, which describe the allegedly infringing database as containing 2.4 million attorney-authored works throughout the country.  [Ex. A (Westlaw Promotional Pages); Ex. B (Heinlein Affidavit) at ¶ 13].  In addition to admitting the numerosity of the subject works, Westlaw has also admitted that very few of the 2.4 million works have been registered.  [West Memorandum in Support of Motion to Dismiss dated April 25, 2012 at p. 2, fn. 1].  Thus, almost all of the 2.4 million works are unregistered works within Heinlein's proposed class.  Presumably there are some putative class members who have multiple works included within Westlaw's database.  Although Heinlein does not know the exact number of unique authors, it can fairly be inferred by this Court that 2.4 million works could not have been authored by

fewer than 40 total individual class members.  Therefore, numerosity should be presumed as a matter of law.

In addition to the large number of class members, there is also significant geographic dispersion of class members.  Indeed, they live and work throughout the United States.  Judicial economy would not be served if a separate lawsuit were instituted in each state throughout the country.

### 2.   Commonality

In <u>Maziarz</u>, this Court explained the commonality requirement of Rule 23(a)(2) as follows:

> Commonality is met if the "plaintiffs' grievances share a common question of law or fact." <u>See</u> <u>Marisol A. v. Giuliani</u>, 126 F.3d 372, 376 (2d Cir.1997).  A single common question is sufficient to meet this standard; however, the question must be of the type that is capable of classwide resolution.  <u>See</u> <u>Wal-mart Stores, Inc. v. Dukes</u>, ⸺ U.S. ⸺, ⸺, ⸺, 131 S.Ct. 2541, 2551, 2556, 180 L.Ed.2d 374 (2011). That is, resolution of the common question "will resolve an issue that is central to the validity of each one of the claims in one stroke." See id. at 2251. In determining commonality, courts should focus on "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." <u>See id</u>. (internal quotations omitted) (emphasis in original).

<u>Maziarz</u>, 2012 WL 638681 at *9.

In the present case, there certainly are common questions of law and fact, as discussed in detail in Sections III-V above.  This commonality derives itself principally from the following facts:  (1) All of the Class Works are the same type of works (i.e., attorney-authored documents that have been filed in court); (2) Westlaw has reproduced the Class Works in the same manner (i.e., verbatim copying); and (3) Westlaw has made the same use of the Class Works (i.e., display within a profit-making, fee-based

database sold to attorneys).  As explained in Section III above, the questions for determining liability are clear: (a) Are the Class Works copyrightable literary works? (b) Does Westlaw's republication of the Class Works constitute impermissible infringement? and (c) Does Westlaw's use of the Class Works constitute a defensible fair use?   For reasons already discussed, Heinlein strongly contends that each of these questions should be answered in favor of the class members.  But regardless of whether Westlaw agrees with the answers, Westlaw cannot dispute that these are the questions that apply to all of the Class Works.

 In addition to the commonality regarding issues of liability, there is also commonality regarding the determination of damages for infringement of the Class Works.  As discussed in Section III.A above, copyright protection for a Class Work is *not* conditioned on obtaining registration from the Copyright Office.  17 U.S.C. § 408(a).  In fact, the registration of a work does not grant a registrant *any* substantive legal rights.  Rather, the sole legal benefit of obtaining registration is that it satisfies the prerequisite for bringing an infringement claim in court pursuant to 17 U.S.C. § 411(a).  As stated by Westlaw and its co-defendants in their brief to the Second Circuit in In re Literary Works in Electronic Databases Copyright Litigation, 509 F.3d 116 (2d Cir. 2007), registration "'is merely the plaintiff's ticket to court,' that once stamped, allows him to raise all sorts of claims arising from unregistered copyrights."  Id. at 123 (2d Cir. 2007) (quoting the brief of Westlaw and its co-defendants).  The correctness of Westlaw's

statement was later confirmed by the Supreme Court in <u>Reed Elsevier v. Muchnick</u>, __ U.S. __, 130 S.Ct. 1237 (2010).

Although Heinlein has obtained registration of his work and he seeks to represent a class of authors who have not obtained registration, the damages recoverable by the Class Works will be determined uniformly in accordance with 17 U.S.C. § 504(b), which provides as follows:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.  In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

An infringer may be liable for certain statutory damages under § 504(c) and attorneys' fees under § 505, but only with respect to works for which the author has obtained registration "within three months after the first publication of the work."  17 U.S.C. § 412.  In the present case, Heinlein is not entitled to any statutory damages under § 504(c) or any attorneys' fees under § 505 because he did not register his work within three months after its first publication.  Similarly, none of the other members of the proposed class have a right to statutory damages or attorneys' fees because they have not registered their works at all.  Like Heinlein, they have the right under § 504(b) to recover damages for infringement that occurred since March 15, 2009, representing the beginning of the three-year limitation period contained in 17 U.S.C. § 507(b).  Therefore, there is commonality – indeed, complete uniformity – in determining damages.  Pursuant to § 504, Heinlein's *prima face* case of damages consists simply of

presenting the Court with Westlaw's gross revenue from March 15, 2009 through the date of trial.  The

burden then shifts to Westlaw to prove which portion of the gross revenue is not attributable to the Class

Works.

Heinlein also seeks an injunction against future infringement of the Class Works under 17 U.S.C.

§ 505, which authorizes "temporary and final injunctions on such terms as [the Court] may deem

reasonable to prevent or restrain infringement of a copyright."  Again, since it is the same conduct of

Westlaw that is being challenged as to all Class Works, there is commonality as to the request for

injunctive relief.

### 3.     Typicality

In Maziarz, this Court explained the typicality requirement of Rule 23(a)(3) as follows:

> Typicality requires that the class representative's claims be typical of the class, such that the
> claims arise from the same course of events, and the class members make similar legal
> arguments in order to prove liability.  See Marisol A., 126 F.3d at 376. Typicality is generally
> met where the plaintiff demonstrates that the same unlawful conduct was directed at both the
> named plaintiff and the proposed class.  See Robidoux, 987 F.2d at 937.

Maziarz, 2012 WL 638681 at *9.

In the present case, the claims of all class members "arise from the same course of events" –

namely, Westlaw's unauthorized verbatim copying of the Class Works and the for-profit republication

of those works to Westlaw's customers.  As discussed in detail in Sections III-IV above, the class

members in this case will "make similar legal arguments in order to prove liability."  It is the "same

unlawful conduct" by Westlaw that has been "directed at both the named plaintiff and the proposed class."  There is no basis to believe that Heinlein's claim is atypical in any way of the claims of other proposed class members.

### 4.   Adequacy

In Maziarz, this Court explained the adequacy requirement of Rule 23(a)(4) as follows:

> [I]n determining whether a plaintiff has established adequacy, courts consider whether the plaintiff's interests are antagonistic to those of the proposed class, and whether the plaintiff's attorneys are "qualified, experienced and able to conduct the litigation."  See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000).

Maziarz, 2012 WL 638681 at *9.

In the present case, Heinlein is an adequate representative of the proposed class.  The fact that he obtained registration of one of his works now allows him to bring this action with respect to the alleged infringement of all Class Works.  Westlaw may argue that obtaining this registration somehow makes Heinlein an *inadequate* representative, because his registration gives him rights that are different from the other members of the class.  Such an argument would be misplaced.  Heinlein does indeed have a right that other class members do not have: the right to bring this action in his own name and to serve as a class representative.  Under 17 U.S.C. § 411(a), no other class member would be able to serve as a class representative unless and until he or she obtained copyright registration.  But this does not mean that Heinlein's interests are "antagonistic" to the proposed class such that he would be an inadequate class representative.

As discussed in Section V above, the Supreme Court has made clear that applying for registration from the Copyright Office is the same as filing a charge with the EEOC or satisfying any other non-jurisdictional precondition to suit: it allows the plaintiff to be a class representative without requiring each individual class member to separately satisfy the precondition.  If satisfying a precondition to suit on behalf of a class rendered the putative class representative *inadequate* under Rule 23(a)(4), then that would be antithetical to – and in violation of – the Supreme Court's holdings in Albermarle Paper Co. v. Moody, 422 U.S. 405 (1975) and Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982).

With respect to the second prong of the adequacy requirement (adequacy of counsel), attached hereto as Exhibit C is an affidavit of Jonathan M. Starble of the law firm of Starble & Harris LLC ("S&H").  As indicated in Attorney Starble's affidavit, S&H has significant experience in complex litigation matters and is committed to prosecuting this case with all necessary resources.  [Ex. C (Starble Affidavit) at ¶¶ 3-4].  Under Rule 23(a)(4), when the proposed class counsel have indicated that they are "committed to prosecuting [the] matter with all necessary resources," that should be sufficient to establish adequacy of counsel absent any good-faith challenge from the defendant.  See, e.g., Maziarz, 2012 WL 638681 at *9.

Under Rule 23(g)(1)(A), a Court considering the adequacy of class counsel must also consider the following factors:

(i)      the work counsel has done in identifying or investigating potential claims in the action;

(ii)     counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii)    counsel's knowledge of the applicable law; and

(iv)    the resources that counsel will commit to representing the class.

The proposed class counsel respectfully submits that the detailed discussion contained in this Memorandum provides evidence that S&H has performed comprehensive work analyzing the potential claims and defenses in this case and has developed significant knowledge of the applicable law specific to this proposed class action.  As stated above, S&H has experience handling complex litigation and will commit the necessary resources to representing the class.

**B.      Specific Prerequisites for Damages Claims Under Rule 23(b)(3)**

In addition to satisfying all general prerequisites under Rule 23(a), any proposed class action must satisfy one or more of the specific prerequisites under Rule 23(b).  Heinlein's claims for monetary relief are being brought under Rule 23(b)(3).  The requirements of that subsection are satisfied if:

the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A)     the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

74

(C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

As explained by this Court in Maziarz:

> The Rule is intended "to cover cases in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."

Maziarz, 2012 WL 638681 at *11 (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615 (1997)).

As discussed in Sections III-V and Section VI.A above, the common questions of law affecting the Class Works and the class members are so significant that they would dwarf by comparison any questions that might affect only individual members.  Individual questions certainly might exist, but the common questions would need to be answered first, and they would certainly dictate the outcome of *all* class claims.  To the extent that Westlaw identifies significant individual issues, such issues can be handled within the context of this action and will not negate the clear superiority of a class action over individual suits.  For instance, in Waldman v. Thomson Reuters Corporation, 2012 ONSC 1138 (CanLII), the Ontario Superior Court of Justice addressed Westlaw's concerns regarding class certification by limiting the certified questions.  The judge found that individual issues surrounding the ownership and copyrightability of class works should be determined individually, but the court

75

nonetheless found that other common issues still predominated and warranted class certification.  [Ex. G (<u>Waldman</u> Class Certification Order)].

The <u>Waldman</u> court's approach was similar to that taken in <u>In re Napster, Inc. Copyright Litigation,</u> 2005 WL 1287611 (N.D.Cal. 2005), a groundbreaking class action involving claims for online copyright infringement.  In <u>Napster</u>, the court certified the class despite the defendants' arguments that individual issues surrounding ownership, registration, and actual damages predominated. The court found that "while it is true that proof of ownership, registration, and actual damages ultimately requires a work-by-work inquiry, viewing these determinations as purely 'individual issues' ignores the fact that the claims of every member of the class are uniformly premised upon the uploading or downloading of a copyrighted work by Napster users. This shared factual predicate in turn gives rise to a host of common legal issues concerning [the defendants'] involvement in the operation of the Napster network." <u>Id.</u> at *7.

In addition, there are many ways in which a court can deal with individual damages issues while still certifying a class action, including the following:  "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." <u>Collins v. Olin Corp.</u> 248 F.R.D. 95, 102-05 (D. Conn. 2008)

(Droney, J.) (quoting In re Visa Check/Master Money Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001)); see also Otte ex rel. Estate of Reynolds v. Life Ins. Co. of North America, 275 F.R.D. 50, 58 (D.Mass. 2011) ("[I]f evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms, such as placing class members whose claims may be barred in a separate sub-class, or excluding them from the class altogether")(internal quotes omitted).

Under Rule 23(b)(3)(B), one issue that a court should consider is "the extent and nature of any litigation concerning the controversy already begun by or against class members."  In the present case, it is appropriate for this Court to consider the case of White v. West Publishing Corp., which is discussed above.  As of the date of this Motion for Class Certification, White is pending in the Southern District of New York.  By the time this Court decides Heinlein's motion, White could be consolidated with the present case (either in Connecticut or New York).  Also, some or all of the claims in White could be dismissed.  But regardless of whether or where either case is pending, it is crucial to emphasize that Heinlein is the *only* plaintiff in either case who has the right to represent unregistered authors against Westlaw, for reasons discussed in Section IV.D above.  Furthermore, Heinlein is the first plaintiff to file a motion for class certification.  Also, even though White and Elan happened to file their case three weeks before Heinlein, they did not file their case *correctly* with respect to claims relating to unregistered works.

With due respect to the plaintiffs' counsel in <u>White</u>, filing an action on behalf of a named plaintiff who had not obtained copyright registration was simply nonsensical and inexplicable. Even if White or Elan somehow obtain the right to represent the authors of unregistered works, they can never change the fact that it was Heinlein – not White or Elan – who first filed a *valid* cause of action on behalf of unregistered authors. Also, the fact remains that there is no overlap between the two actions with respect to LexisNexis, because Heinlein has only sued Westlaw. There is no reason the two competing online publishers need to be defendants in the same case; and in fact, LexisNexis agrees that they should *not* be defendants in the same case. Certifying Heinlein's class as against Westlaw will not in any way prejudice White or Elan, nor will it restrict their freedom to choose how they wish to pursue claims against LexisNexis.

### C.      Specific Prerequisites for Injunctive and Declaratory Claims Under Rule 23(b)(2)

In addition to Heinlein's claims for class monetary damages up through the date of trial, Heinlein also seeks a class injunction against future infringement under Rule 23(b)(2), which is an appropriate remedy when:

> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

As explained by this Court in <u>Maziarz</u>:

> Rule 23(b)(2) authorizes class certification where a single injunction would provide relief to each member of a proposed class. <u>See</u> <u>Wal-mart Stores, Inc. v. Dukes</u>, ___ U.S. ___, 131 S.Ct. 2541,

2557, 180 L.Ed.2d 374 (2011).  Class certification under Rule 23(b)(2) is not appropriate where each class member would be entitled to a different injunction against the defendant, or to individualized monetary damages.  See id.

Maziarz, 2012 WL 638681 at *10.

In the present case, the relevant acts of Westlaw (i.e., the ongoing inclusion of the Class Works in Westlaw's database) "apply generally to the class," and Heinlein seeks a single injunction as to all Class Works.  Specifically, Heinlein seeks an order requiring Westlaw to remove all Class Works from its database and to cease the underlying infringing practice.  This type of injunctive relief would be appropriate as to the entire class if Heinlein prevails on his infringement claim.

## VII.   **CONCLUSION**

For the foregoing reasons, the plaintiff respectfully moves for this Court to certify the class in accordance with the proposed class definition set forth in Section II above and to appoint Starble & Harris LLC as class counsel.

                              PLAINTIFF,

                              DAVID J. HEINLEIN


                         By: /s/ Jonathan M. Starble
                              Jonathan M. Starble [ct15285]
                              STARBLE & HARRIS LLC
                              Avon Park South
                              One Darling Drive
                              Avon, CT 06001
                              Telephone: (860) 678-7775
                              Facsimile: (860) 678-8887
                              Email: jstarble@starbleharris.com

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that a copy of the foregoing Memorandum in Support of Motion for Class

Certification was filed electronically on May 15, 2012.  Notice of this filing will be sent via e-mail to all

parties by operation of the Court's electronic filing system.  Parties may access this filing through the

Court's CM/ECF system.


<u>/s/ Jonathan M. Starble</u>